**In re TEXACO INC., Texaco Capital, Inc., Texaco Capital N.V., Debtors.**

**TRANS WORLD AIRLINES, INC., ACF Industries, Incorporated, Swan Management Corp., and Unicorn Associates Corporation, Appellants,**

v.

**TEXACO, INC., Texaco Capital, Inc., Texaco Capital N.V., and Pennzoil Company, Appellees.**

**Bankruptcy Nos. 87 B 20142 (HS)–87 B 20144 (HS).**

**No. 88 Civ. 2800 (GLG).**

United States District Court, S.D. New York.

Sept. 28, 1988.

Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City (David M. Friedman, Timothy T. Brock, of counsel), for appellants.

Weil, Gotshal & Manges, New York City (Harvey R. Miller, Stephen Karotkin, Jacqueline Marcus, Lori R. Fife, Kevin W. Barrett, of counsel), for appellees Texaco Inc., Texaco Capital Inc., and Texaco Capital N.V.

Levin & Weintraub & Crames, New York City (Michael J. Crames, Myron Trepper, of counsel), Paul Weiss, Rifkind, Wharton & Garrison, New York City (Simon H. Rifkind, of counsel), Baker & Botts, Houston, Tex. (John L. Jeffers, G. Irvin Terrell, David A. Burns, Keith P. Ellison, Susan E. Roehm, Mary M. Gregory, of counsel), Stutman, Treister & Glatt, Los Angeles, Cal. (Isaac M. Pachulski, Kenneth N. Klee, Mark A. Miller, Audrey J. Wohlgemuth, of counsel), for appellee Pennzoil Co.

Kramer, Levin, Nessen, Kamin & Frankel, New York City (Joel B. Zweibel, Geoffrey M. Kalmus, Kenneth H. Eckstein, Suzanne L. Telsey, Jason Brown, of counsel),

for the Gen. Committee of Unsecured Creditors of Texaco Inc., et al.

Keck, Mahin & Cate, Chicago, Ill. (Dennis M. O'Dea, of counsel), for Committee of Equity Security Holders of Texaco, Inc.

Lasky, Haas, Cohler & Munter, San Francisco, Cal. (Charles B. Cohler, Thomas E. Woodhouse, of counsel), for Gordon P. Getty.

Dechert Price & Rhoads, New York City, and Philadelphia, Pa. (Steven B. Feirson, Melvin A. Schwarz, of counsel), for Former Getty Oil Co. Directors: For former Directors Petersen, Wendt, Tisch, LaForce, Medberry, Stuart, Berg, Mitchell, Boothby and Teets, and the Estate of Mr. Miller.

Miro, Miro and Weiner, New York City (Deborah S. Minowitz, of counsel), for former Directors Taubman and Allison.

## OPINION

GOETTEL, District Judge:

The "rich" history of this case—involving the largest civil damages award in history, the largest bankruptcy in history, perhaps the largest settlement in history, and undoubtedly the largest attorney's fees in history—now moves to its next (and, hopefully, its last) chapter.

On March 23 of this year, the bankruptcy court in this district, the Honorable Howard Schwartzberg presiding, confirmed the Chapter 11 reorganization plan of Texaco Inc. ("Texaco"). *In re Texaco Inc.*, 84 B.R. 893 (Bankr.S.D.N.Y.1988). Included as part of that plan was a $3 billion payment to the Pennzoil Company ("Pennzoil") as settlement of the widely publicized litigation spawned by Texaco's takeover of the Getty Oil Company ("Getty"). As is well known, it was that litigation and the resulting judgment of over $11 billion that precipitated Texaco's decision to file for reorganization under Chapter 11.

Following the commencement of Texaco's Chapter 11 proceedings, a group of companies owned or controlled by Carl Icahn began buying Texaco stock. Those firms—Trans World Airlines, Inc., ACF Industries, Inc., Swan Management Corp., and Unicorn Associates Corp. (referred to collectively hereinafter as the "Icahn Group")—now own approximately 14.8% of Texaco's outstanding shares of common stock and collectively are Texaco's largest stockholders.

The Icahn Group, appellants herein, challenge two aspects of the now-confirmed reorganization plan, to be described *infra*. The upshot of their argument is that these provisions are unnecessary to Texaco's successful reorganization and, indeed, are contrary to the best interests of Texaco shareholders. The contention, mainly, is that the offending provisions were included as a result of self-dealing by Texaco's officers and Board of Directors and, thus, should be severed from the reorganization plan.

We hold today that, whatever the merits of these challenges, this appeal must be dismissed as moot.

## I. BACKGROUND

Texaco and Pennzoil have been competitors in the petroleum industry for years. With Texaco's takeover of Getty for $128 a share on January 6 and 7, 1984, however, the battleground of their competition shifted from the oil fields to the courts. We summarize below, as concisely as possible, the ensuing litigation, resulting bankruptcy and reorganization plan, and subsequent challenges to that plan by the Icahn Group which serve as the bases of this appeal.

### a. The Litigation History

Prior to Texaco's takeover bid, Pennzoil had been negotiating with Getty on a package whereby Pennzoil would purchase approximately three-sevenths of Getty's shares at $110 a share. Contending that an agreement to this effect had been reached prior to Texaco's successful bid, Pennzoil commenced an action in the Delaware Court of Chancery on January 10, 1984 to enjoin the Texaco–Getty merger. After the Delaware court refused preliminarily to enjoin the Texaco bid, *Pennzoil Co. v. Getty Oil Co.*, No. 7425 (Del. Ch. Feb. 6, 1984) (LEXIS), Pennzoil withdrew its claim and, on February 18, 1984, brought suit against Texaco in the Harris

County Court for the 151st Judicial District of Texas. The complaint, like that filed in the original Delaware action, alleged that Texaco's takeover tortiously interfered with the allegedly existing agreement between Pennzoil and Getty. On November 19 of that year, a Texas jury agreed with Pennzoil and awarded $7.53 billion in actual damages and $3 billion in punitive damages on its claim. On December 10, the trial court entered judgment in the amount of over $11.1 billion, adding approximately $600 million in prejudgment interest to the jury's award (the "Pennzoil Judgment").

As one might imagine, this celebrated award—the largest civil award in U.S. history (and perhaps in the world)—had an immediate and devastating impact upon Texaco. The price of its stock dropped appreciably, its credit and bond ratings were lowered, and it was unable to obtain crude oil from trade creditors on customary terms. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 1523, 95 L.Ed.2d 1 (1987). These problems were compounded by the fact that, under Texas law, a judgment creditor may secure a writ of execution on its judgment usually within thirty days from the time judgment is entered. Tex.R.Civ.P. 627. To suspend execution on the judgment, the judgment debtor must file a bond at least equal to the total cost of the judgment plus interest. Tex.R.Civ.P. 364. *See generally Pennzoil*, 107 S.Ct. at 1522–23 (discussing these issues).

In this case, the resulting bond total would have amounted to over $13 billion, which far outstrips the world's surety bond capacity of less than $2 billion. *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1138 (2d Cir.1986), *rev'd*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Moreover, when the Pennzoil Judgment was entered, the net worth of Texaco, as measured by the stock market, was in the vicinity of $9.5 billion, although Pennzoil (and others) argued that this total was grossly undervalued. *Texaco, Inc. v. Pennzoil Co.*, 626 F.Supp. 250, 253 (S.D.N.Y.), *modified*, 784

F.2d 1133 (2d Cir.1986), *rev'd*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Whatever Texaco's actual worth may have been, it is clear that the jury's award, if left materially intact, would have proven ruinous to Texaco.[1]

Confronted by these staggering prospects, Texaco, on the day the trial court entered judgment, brought suit in Federal court to challenge both the Pennzoil Judgment and the Texas bond provisions. It alleged that the Texas jury award violated various aspects of federal law and that the Texas bond provisions violated the Due Process Clause of the Fourteenth Amendment by effectively denying Texaco's right to appeal. On January 10, 1986, this court granted Texaco's motion for a preliminary injunction preventing Pennzoil from executing on its judgment. *Texaco, Inc. v. Pennzoil Co.*, 626 F.Supp. 250 (S.D.N.Y. 1986) (Brieant, J.). That decision was affirmed on more limited grounds in *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133 (2d Cir.1986). The Supreme Court, however, reversed, holding that, in light of the pending Texas litigation, principles of abstention dictated that the Federal courts refrain from interfering in the Texaco–Pennzoil brawl in its then-existing posture, suggesting that there were other avenues of relief available to Texaco. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).

On April 12, 1987, six days after the Supreme Court's decision and with interest on the Pennzoil Judgment accruing at the rate of $2.8 million per day, Texaco filed for reorganization under Chapter 11 of the Bankruptcy Code. Joining in the filing were two of Texaco's wholly-owned subsidiaries, Texaco Capital Inc. and Texaco Capital, N.V. It was management's assessment that, in addition to providing time for negotiation of a settlement, a Chapter 11 filing was the only remaining, viable means by which appeal of the Pennzoil Judgment could be pursued. Second Amended Disclo-

---

1. We note that, upon consent of the parties, the Pennzoil Judgment included a provision barring Pennzoil from enforcing its judgment so long as the Texas trial court retained jurisdiction over the case. That period ultimately lasted until March 7, 1986, and Pennzoil refused to provide further relief beyond that date.

sure Statement, *In re Texaco Inc.*, Nos. 87 B. 20142, 20143, & 20144, § III.F., at 10 (Bankr.S.D.N.Y. Jan. 29, 1988) (Exh. # 1 at confirmation hearing) [hereinafter the "Disclosure Statement § ——, at ——"].

In the interim, Texaco pursued appeals with the Texas courts. On February 12, 1987, the Court of Appeals for the First Supreme Judicial District of Texas substantially affirmed the Pennzoil Judgment, subject only to a $2 billion remittitur of the punitive award (to which Pennzoil agreed). On November 2 of 1987, Texaco having since filed for bankruptcy, the Texas Supreme Court denied Texaco's motion for appeal without hearing, concluding that no reversible error had been committed by the lower courts. That left Texaco with the sole remaining option of appealing the Pennzoil Judgment to the United States Supreme Court. Pursuant to a stipulation between Texaco and Pennzoil designed to allow time for settlement negotiations, Texaco requested and was granted an extension of time in which to file a petition for a writ of *certiorari* until March 31, 1988— the maximum extension permitted under the Supreme Court's rules. *Kirk v. Texaco, Inc.*, 82 B.R. 678, 680 (S.D.N.Y.1988).

The above-described actions were not the only litigation spawned by the Texaco–Getty merger. Following quickly on the heels of the Texas jury verdict, certain of Texaco's shareholders brought derivative actions (seventeen in all) against (i) Texaco's officers and directors, (ii) Getty and its shareholders and directors (the "Getty defendants"), and (iii) Texaco's and Getty's investment bankers. These actions remained pending when Texaco instituted its Chapter 11 proceedings.

### b. *The Reorganization Plan*

Excepting the Pennzoil Judgment, Texaco was an otherwise solvent concern.[2] The

central thrust of the reorganization, therefore, was reaching a settlement with Pennzoil, Texaco's largest unsecured creditor. After months of haggling, and spurred by the salutary actions of the bankruptcy court, Texaco and Pennzoil reached a comprehensive settlement of their dispute on December 19, 1987 (the "Settlement Agreement").[3] Two days later, the parties joined in submitting a proposed plan of reorganization. That plan was twice amended, with the Second Amended Joint Plan of Reorganization (the "Reorganization Plan" or the "Plan") being filed with the bankruptcy court on January 27, 1988. The Plan had the support of both the Committee of General Unsecured Creditors and the Committee of Equity Security Holders.

The contents of the Plan are comprehensively set forth in the opinion below. *Id.* at 894–96. We need not expand on the bankruptcy court's thorough presentation. For purposes of this appeal, the salient aspects of the Plan can briefly be summarized as follows.

With the exception of Pennzoil, which agreed to a $3 billion cash payment in settlement of its claim, all claims are to be paid in full. *Id.* No class of claims was deemed to be impaired and, accordingly, creditors were not entitled to vote for the Plan. Texaco shareholders retained their equity interests, but were deemed impaired for purposes of the Plan to afford them the opportunity to vote on the proposal. *Id.* at 896. The Plan had the full support of the statutory committees and was approved by approximately 96% of Texaco's voting shareholders. *Id.* at 904.

The centerpiece of the Plan was the $3 billion Pennzoil settlement, over $8 billion less than Pennzoil's outstanding claim. As the quid pro quo for that settlement, the bankruptcy court found that Pennzoil insisted on a provision in the Plan releasing

---

2. Indeed, it has been reported that Texaco is this country's third-largest oil company and fifth-largest company overall. *Texaco, Inc. v. Pennzoil Co.*, 626 F.Supp. 250, 252 (S.D.N.Y.), *modified*, 784 F.2d 1133 (2d Cir.1986), *rev'd*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).

3. The parties agree that the bankruptcy court's orders on December 2 and 8, 1987, which conditionally granted an extension of the exclusive period in which Texaco would be allowed to file a reorganization plan under 11 U.S.C. § 1121, coupled with the Texas Supreme Court's decision of November 2, served as the catalysts for a settlement.

all parties from liability in any present or future litigation stemming from the Texaco–Getty merger. As noted *supra,* Texaco had until March 31 to file a petition for a writ of *certiorari* with the Supreme Court relating to the Pennzoil Judgment, and seventeen different derivative actions had been initiated by certain Texaco shareholders shortly after the Pennzoil Judgment was rendered. Two had been withdrawn, leaving fifteen such actions outstanding when the Reorganization Plan was proposed.

As part of the Plan, therefore, the following provisions (hereinafter the "Release Provisions") were expressly included: (1) Texaco and Pennzoil released each other from all claims arising out of the Texaco–Getty merger, including Texaco's agreement to withdraw efforts to seek a writ of *certiorari* before the Supreme Court; (2) Texaco and Pennzoil agreed to release the Getty defendants from all such pending and future claims upon receipt of a reciprocal release by those parties; (3) the derivative actions brought by Texaco shareholders would be dismissed; and (4) Texaco agreed to indemnify its management from all future claims arising out of the Texaco–Getty merger. *In re Texaco,* 84 B.R. at 896; Disclosure Statement Exh. A, at A–16 (Art. VII.M. of the Plan).[4]

To finance the $3 billion cash payment to Pennzoil, Texaco moved under 11 U.S.C. § 364(c)[5] for court approval of a financing agreement providing for secured revolving credit with a syndicate of banks totalling, in the aggregate, $3 billion (the "Financing Agreement"). That motion was approved. *In re Texaco,* Bankr. Nos. 87 B. 20142, 20143, & 20144, at 13 (Bankr. S.D.N.Y.

Mar. 23, 1988) [hereinafter the "Confirmation Order, at ——"].[6]

The Financing Agreement, since executed, contains an acceleration clause in the event of default, which is defined to include a "change in control" of Texaco's then-existing management. The agreement provides:

[A] "Change in Control" shall be defined to occur if (a) directors in office on the date hereof and their nominees shall no longer constitute at least a majority of Texaco's Board of Directors or (b) any person or group (as defined in the Securities Exchange Act of 1934) acquires ownership of more than 30% of Texaco stock issued and outstanding.

Financing Agreement § VII(i), at 28–29 (Exh. # 21 at confirmation hearing) [hereinafter the "Change–in–Control Clause"].

### c. The Icahn Group Challenges

The Icahn Group challenges both the Release Provisions of the Plan and the Change–in–Control Clause of the Financing Agreement on this appeal.[7] It asserts, in essence, that both are the product of self-dealing by Texaco management in contradistinction to the interests of Texaco shareholders. It contends that neither provision is necessary to a successful reorganization, and urges that they be rescinded or severed from the Reorganization Plan and Financing Agreement, respectively.

As to the Release Provisions, they initially were opposed by both the shareholder-plaintiffs in the derivative actions and the Icahn Group. *In re Texaco,* 84 B.R. at 897. On the day the confirmation hearing commenced, however, the shareholder-plaintiffs

---

4. A putative class action instituted in this district by a Texaco stockholder apparently is not being dismissed pursuant to the Release Provisions. Disclosure Statement § IV.D., at 14.

5. 11 U.S.C. § 364(c) provides, in pertinent part:
(c) If the trustee is unable to obtain unsecured credit allowable ... as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— ... (2) secured by a lien on property of the estate that is not otherwise subject to a lien....

6. The Confirmation Order approved both the Reorganization Plan and the Financing Agreement.
As security for the loan in question, Texaco offered the bank syndicate a lien on stock in three Texaco subsidiaries—Caltex Petroleum Corp., Texaco Canada Inc., and Texaco Trading and Transport, Inc. The Icahn Group notes that the collateral package has a value of $3.6 billion, providing the lenders with a $600 million cushion.

7. Both challenges were asserted, unsuccessfully, at the confirmation hearing.

withdrew their objections to the Plan. *Id.* at 898.[8]

The Icahn Group maintained its objections and renews them on appeal. It contends that the derivative actions constituted a valuable asset of the estate which cannot be abandoned. *See* 11 U.S.C. § 554(a) (allowing abandonment only of property "that is burdensome to the estate or that is of inconsequential value and benefit to the estate"). They contend further that the Release Provisions are the product of self-dealing by Texaco's management, constituting a breach of their fiduciary duties to the shareholders. Consequently, they argue, the Release Provisions must be severed from the Reorganization Plan (leaving the rest of the Plan intact) since they are neither fair nor equitable. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (holding court may strike down compromises embodied in reorganization plan that are not "fair and equitable"), *reh'g denied,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968).

The bankruptcy court found the derivative actions to be of "questionable value," and found further that Pennzoil insisted on the Release Provisions as a quid pro quo for agreeing to a settlement of some $8 billion less than its total unsecured claim. *In re Texaco,* 84 B.R. at 904. Under those circumstances, the court declined to sever these provisions from what it viewed as a "consensus" agreement. *Id.* At this time, all derivative actions have been dismissed, and Texaco has withdrawn its petition for certiorari before the Supreme Court.

As to the Change–in–Control Clause, the Icahn Group objects to the fact that Texaco management did not oppose inclusion of the clause in the agreement. This demonstrates, in appellants' view, that the clause is the product of self-dealing by Texaco management, undergirding their assertion that the clause is neither fair nor reasonable and should be rescinded. *See In re Crouse Group, Inc.,* 71 B.R. 544, 551 (Bankr.E.D.Pa.1987) (holding that extension of secured credit under 11 U.S.C. § 364(c) must be "fair, or reasonable"). In approving the financing terms, the bankruptcy court found that the agreement had "been negotiated in good faith and at arm's length...." Confirmation Order, at 15. At this point in time, the credit has been secured and the $3 billion cash payment to Pennzoil has been made.

## II. DISCUSSION

Bankruptcy Rule 8005 sets forth the procedures to be employed by a party seeking a stay of judgment by the bankruptcy court pending appeal.[9] There is no general requirement, nor has there ever been, that one *must* obtain a stay as a precondition for appeal. *In re AOV Indus., Inc.,* 792 F.2d 1140, 1147 (D.C.Cir.1986); 9 Collier on Bankruptcy ¶ 8005.04, at p. 8005–5 (15th ed. 1988).[10] Nonetheless, it may be incum-

---

8. Their concession was not without a price. As quid pro quo, the shareholder-plaintiffs' attorneys were allowed to file applications for pre- and post-petition legal services not to exceed the total amount of $10 million. *In re Texaco,* 84 B.R. at 898. Just how these attorneys could have accumulated the staggering sum of $10 million in legal fees when, presumably, the derivative actions were still in their infancy is something of an imponderable. Judge Schwartzberg apparently agreed, as reflected in his recent opinion awarding total fees and disbursements of $518,430.84 to these attorneys (although, not surprisingly, a request was made for the full $10 million). *In re Texaco,* 90 B.R. 622 (Bankr.S.D.N.Y.1988).

9. Bankruptcy Rule 8005 provides, in pertinent part:

A motion for a stay of judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.... A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge.

10. The Bankruptcy Code does require that a stay pending appeal be obtained in certain, specified circumstances. *See* 11 U.S.C. § 363(m) (requiring stay when appeal involves trustee's sale or lease of property of the estate) and *id.* at § 364(e) (requiring stay when appeal involves authorization to obtain credit or incur debt pur-

bent upon a party appealing a bankruptcy court's ruling to seek a stay lest the appeal in question be rendered moot by constitutional or related equitable/jurisprudential considerations.

The mootness doctrine is premised first and foremost on the fundamental jurisdictional tenet that Federal courts are empowered to hear only live cases and controversies. U.S. Const. art. III, § 2. Thus, it is well settled that

> when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for [the appellate] court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal [as moot].

*Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). *See also Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) (mootness doctrine "avoid[s] advisory opinions on abstract propositions of law").

■ This constitutional principle retains its vitality in the context of a bankruptcy appeal. *See, e.g., Miami Center Ltd. Partnership v. Bank of New York,* 838 F.2d 1547, 1554, 1556 (11th Cir.1988) (holding mootness appropriate in bankruptcy appeal when court cannot fashion effective relief); *Metro Property Management Co. v. Information Dialogues, Inc. (In re Information Dialogues, Inc.),* 662 F.2d 475, 476 (8th Cir.1981) (holding "mootness concern arises when, as here, it may be impossible for a court to grant effective relief because the disputed assets have been transferred pursuant to the reorganization plan"). In the absence of a stay, events may have so progressed by the time a bankruptcy appeal is adjudicated that an appellate court is powerless to grant the appellant effective relief, thereby depriving that court of its constitutional jurisdiction over the matter. When such is the case, the appeal must, as a matter of law, be dismissed as moot.

In addition to these constitutional concerns, "there exists what [have been] called a 'melange of doctrines relating to the court's discretion in matters of remedy and judicial administration.'" *AOV Industries,* 792 F.2d at 1147 (quoting *Chamber of Commerce v. United States Dep't of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980)). Under this "cousin of the mootness doctrine," *Chamber of Commerce,* 627 F.2d at 291, equitable principles of jurisprudence may dictate that a case be dismissed as moot even though a court may properly exercise its article III jurisdiction.

■ Again, in the bankruptcy context, these equitable principles retain an important role. Like any court-ordered judgment, the debtor and its creditors are free to execute on the judgment of a bankruptcy court in the absence of a stay pending appeal. 9 Collier on Bankruptcy ¶ 8005.04, at p. 8005–5 (15th ed. 1988). When a confirmed plan of reorganization is involved, as in the instant case, it is not hard to imagine that hundreds or even thousands of good-faith transactions by innocent parties may be undertaken in reliance thereon before an appeal is decided on the merits. Under such circumstances, it would be manifestly unjust to reverse on appeal, thereby "knock[ing] the props out from under the authorization for every transaction that has taken place...." *Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.),* 652 F.2d 793, 797 (9th Cir. 1981). Thus, it has been held that when bankruptcy appellants "'have failed and neglected diligently to pursue the available remedies to obtain a stay' of the Confirmation Order and thereby 'have permitted such a comprehensive change of circumstances to occur,' it is inequitable to hear the merits of their case." *Lawrence v. Revere Copper and Brass Inc. (In re Revere Copper and Brass Inc.),* 78 B.R. 17, 23 (S.D.N.Y.1987) (Leisure, J.) (quoting *Roberts Farms,* 652 F.2d at 798). This equitable rule is rooted firmly in sound notions of public policy, and promotes the orderly administration of estates by "af-

---

suant to 11 U.S.C. § 364). The latter provision is pertinent to the $3 billion in secured credit

obtained pursuant to the Financing Agreement, and will receive additional attention, *infra.*

fording finality to the judgments of the bankruptcy court." *Id.* at 21. *See also Information Dialogues,* 662 F.2d at 477 (noting that "mootness doctrine promotes an important policy of bankruptcy law— that court-approved reorganizations be able to go forward in reliance on such approval unless a stay has been obtained").

Guided by these principles of constitutional and equitable jurisprudence, we turn to the instant challenges. The Icahn Group asks that we sever the Release Provisions and the Change-in-Control Clause, leaving intact all other aspects of the Reorganization Plan and the Financing Agreement. At no time, however, has the Icahn Group sought a stay pending this appeal—this despite the fact that the Plan expressly provided for a fifteen-day window between entry of the Confirmation Order and consummation in which a stay might have been sought. Disclosure Statement § VIII.F., at 39.[11] Consequently, in proper reliance upon the Confirmation Order as a final judgment from a court of appropriate jurisdiction, there has been "substantial consummation" of Texaco's reorganization:[12] $2.3 billion has been distributed to creditors other than Pennzoil; $200 million has been paid to the Internal Revenue Service; $7 billion in long-term debt and guaranty obligations have been reinstated; Texaco's certificate of incorporation and by-laws have been amended to comply with the Bankruptcy Code; the $3 billion settlement with Pennzoil has been satisfied, and the lenders have been granted the security interests contemplated under the Financing Agreement; all derivative actions have been dismissed and Texaco has withdrawn its petition for a writ of *certiorari* before the Supreme Court; and hundreds of releases have been executed between Texaco,

Pennzoil, and third parties releasing them from all claims arising out of the Texaco–Getty merger. Moreover, it is not unreasonable to assume that there have been thousands of Texaco shares innocently traded since April 7, 1988, the effective date of the Plan, in reliance upon the confirmed Reorganization Plan. Numerous transactions in Texaco's ordinary course of business also undoubtedly have transpired against the backdrop of the confirmed Plan.

Under these circumstances, there fairly exists a "strong presumption" that appellants' challenges have been rendered moot due to their inability or unwillingness to seek a stay. *AOV Industries,* 792 F.2d at 1149. This presumption is undergirded by the common-sense notion that the "piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions" is, in practical terms if nothing else, a virtually impossible task. *Id. Accord Barry v. Smith (In re New York, New Haven and Hartford R.R.),* 632 F.2d 955, 959 n. 2 (2d Cir.) (dictum), *cert. denied sub nom., Barry v. American Financial Enter., Inc.* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980). Moreover, it is inherently improbable, once there has been "substantial consummation," that an appellate court will be able to fashion effective relief. *Revere Copper and Brass,* 78 B.R. at 21 (citing *Information Dialogues,* 662 F.2d at 477). We begin with a presumption, therefore, that this appeal is moot.

█ "Substantial consummation" in the absence of a stay, however, does not automatically discharge this court of its appellate jurisdiction. We remain bound "to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization

---

11. Indeed, we suspect that it may come as something of a shock to certain of Texaco's shareholders and creditors to learn that an appeal of certain aspects of the Confirmation Order was pending before this court.

12. "Substantial consummation" is a term of art under 11 U.S.C. § 1101(2), meaning:
   (A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
(C) commencement of distribution under the plan.

scheme as a whole." *AOV Industries,* 792 F.2d at 1148. *Accord Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.,* 841 F.2d 92, 96 (4th Cir.1988). In *AOV Industries,* for example, the District of Columbia Circuit Court of Appeals denied mootness challenges to both a creditor's claim of unfair treatment and an allegedly improper award of attorney's fees since, even though reorganization had been substantially consummated, resolution of those individual claims would not affect the overall reorganization. *AOV Industries,* 792 F.2d at 1149.

Thus, appellants' challenges rest on our ability to sever the Release Provisions and the Change–in–Control Clause from the Reorganization Plan and Financing Agreement, respectively, without in turn disrupting the now-consummated reorganization. As suggested by the *AOV Industries* court, this is a fact-specific inquiry. *Accord Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449, 463 (6th Cir.1982). On the facts of this case, we find that such a route cannot be traveled and the appeal, therefore, must be dismissed as moot.[13]

### 1. The Release Provisions

■ As noted *supra,* settlement of the Pennzoil claim was the *sine qua non* of the Texaco bankruptcy, a point not disputed by appellants. *See* Appellants' Brief at 6 (conceding that Pennzoil Judgment was "sole factor which necessitated Texaco's Chapter 11 filing"). As part of the Settlement Agreement, Texaco and Pennzoil included a provision mutually releasing each other from all claims stemming from the Texaco–Getty merger. Disclosure Statement Exh. 1 to Exh. A, at A–24. The Release Provisions included in the Plan, however, move beyond the Settlement Agreement by releasing *all* claims arising out of the Texa-

co–Getty merger, discontinuing the derivative actions, and indemnifying Texaco management—issues in which, it is claimed by appellants, Pennzoil retained no interest. Consequently, it is urged, the Release Provisions are not truly a part of the vital Pennzoil Settlement Agreement and may be severed from the Reorganization Plan without jeopardizing the settlement or the reorganization. As appellants' counsel contends: "The Releases were gratuitously granted by Texaco. They can be taken away just as easily as they were given.... Thus, there is no impediment to an appeal going forward without a stay." Appellants' Reply Brief, at 8.

To the contrary, the bankruptcy court found that the Release Provisions are part of "an integrated settlement," *In re Texaco,* 84 B.R. at 904, and later termed the Reorganization Plan a "comprehensive," "consensus" Plan. *Id.* at 904. We concur, and find that to sever the Release Provisions, as broadened and approved, would undermine both the Settlement Agreement and the Reorganization Plan. Consequently, the challenge cannot stand.

First, the Settlement Agreement expressly notes that it is interlocked with the Reorganization Plan, and vice versa:

> WHEREAS, the Plan provides that this Settlement Agreement is an essential element and means of execution of the Plan; and
>
> WHEREAS, the Plan is an essential element and means of execution of this Settlement Agreement....

Disclosure Statement Exh. 1 to Exh. A, at A–23.

Second, the testimony that was offered confirmed this interdependency. For example, Alfred C. DeCrane, Chairman of Texaco, when asked on cross-examination by a Pennzoil attorney if he thought the

---

13. We note that this task, although necessarily implicating certain factual analysis, is separate and distinct from determining whether, if these challenges are not moot (*i.e.,* if the Release Provisions and Change–in–Control Clause may legitimately be severed), the bankruptcy court abused its discretion in allowing inclusion of these provisions as part of the reorganization. The latter determination goes to the merits of

this appeal. As to the inquiry at hand, we note that resolution of factual disputes and issues bearing on witness credibility are matters distinctly within the province of the bankruptcy court, and will not be disturbed on appeal unless found to be clearly erroneous. Bankr. Rule 8013; *Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.),* 366 F.2d 584, 588 (2d Cir.1966).

**48**

Pennzoil settlement and the Reorganization Plan were "inextricably intertwined," replied, "Yes, Sir." Transcript of the Hearing on Confirmation, *In re Texaco Inc.*, Nos. 87 B. 20142, 20143, & 20144, at 136 (Bankr.S.D.N.Y. Mar. 22–23, 1988) [hereinafter "Tr. at ——."].

Even more enlightening is the unequivocal testimony of Baine Kerr, Chairman of Pennzoil's Executive Committee:

Q  Would Pennzoil agree to modifying the plan so as to eliminate [the Release Provisions]?

A  No.

Q  Could you tell us why?

A  Well, we look at it as a single integrated plan. The settlement and the plan are all one and the same.

We viewed this as something that was desirable in order to make a final disposition of this whole matter to reach a speedy settlement and one that would be final, that would not have lingering over a lot of additional litigation that could drag on for years and that could affect the ability of Texaco to finance a settlement.

So, what we traded off was a very substantial reduction of our claim against getting a prompt resolution of this matter, a final resolution and we thought that that included, as well, all of the ancillary litigation.

Q  Simply put, Mr. Kerr, would Pennzoil go forward with the plan and the settlement if these provisions were eliminated?

A  No, we would not.

Tr. at 217–18.

Appellants note that Mr. Kerr, when pressed by appellants' counsel on the possibility that the Release Provisions might be struck from the Reorganization Plan, testified as follows: "Well, we approved a plan that included a termination of all this litigation. If we don't get that, we would have to go back to our board." Tr. at 220. From this appellants infer that Pennzoil's insistence on the Release Provisions is "soft" and that the provisions, therefore, could be severed without disrupting the Plan.

Appellants, however, conveniently omit from the above excerpt Mr. Kerr's concluding line: "I cannot speak to that [*i.e.,* whether the Pennzoil board would approve a plan absent the Release Provisions], but I would doubt that we would go forward with it." *Id.* at 221. With that, the following exchange ensued:

Q  You would risk $3 billion in cash because Texaco would not be releasing third parties to litigation, is that my understanding?

A  We have a judgment for what, $11 billion, so we are not releasing that.

Q  No, but if I can just understand, Mr. Kerr, you have the opportunity under the plan to obtain $3 billion in cash, is that correct?

A  *Provided all the terms of the plan match.*

*Id.* (emphasis added).

Appellants insist, however, that Kerr's testimony must be considered a charade. They point especially to the testimony of Hugh Liedtke, Pennzoil's Chairman of the Board and Chief Executive Officer, who noted that he had "never been impressed" by the possibility that Pennzoil would be drawn into ancillary litigation over the Texaco–Getty merger, Tr. at 227, adding, "[T]hat's not really the reason for the releases." *Id.* Thus, they argue, the Release Provisions cannot fairly be said to constitute part of Pennzoil's bargained-for consideration. We think this argument misses the mark.

First, notwithstanding Mr. Liedtke's testimony, the bankruptcy court found that Pennzoil had insisted on the Release Provisions at least in part to avoid being drawn into other litigation stemming from the Texaco–Getty merger. *See In re Texaco,* 84 B.R. at 904 (suggesting that Pennzoil might be impleaded in the derivative actions on grounds that it violated federal securities laws in its alleged agreement with Getty); Disclosure Statement § VII.E.1., at 30 (noting that Release Provisions included in part because "Pennzoil did not want to become involved in any further litigation arising from the [Texaco–

Getty merger]"). Although Mr. Liedtke personally may have "never been impressed" with the notion that Pennzoil would be named as a party in any ensuing litigation, this court has already been exposed to the kinds of far-fetched claims implicating Pennzoil that can be conjured up in the fertile minds of lawyers allowed to run amok in the litigation wonderland spawned by the Texaco–Getty merger. *See Crigler v. Pennzoil Co.*, 687 F.Supp. 120 (S.D.N.Y.1988) (this court's decision dismissing claim that Pennzoil, through its $11 billion judgment, tortiously interfered with Texaco debenture agreements by driving Texaco into bankruptcy and thereby forcing Texaco's default on those agreements). Indeed, there was testimony that the Getty defendants advised lawyers for Pennzoil "that if Texaco were to file a suit against the Sarah Getty Trust, under the warranty claims in the agreement, that the Sarah Getty Trust would, in turn, sue Pennzoil on the theory of misrepresentation...." Tr. at 211. Undoubtedly, the Pennzoil lawyers who helped negotiate the Settlement Agreement had a keener appreciation than did Mr. Liedtke for the full range of litigation possibilities that might implicate Pennzoil.

In addition, the headache and financial burden to Pennzoil created by future litigation on this matter would not be limited to Pennzoil's direct involvement as a named party. Pennzoil officers most certainly would be a necessary part of any discovery in the litigation avalanche burying Texaco, the Getty defendants, or both. That drain, both in terms of personnel hours and financial resources, might be considerable. Thus, as Chief Judge Brieant opined in an earlier appeal in this case:

> The Court believes that Pennzoil never wants to hear the name of Texaco again —excepting, of course, on the day Texaco's $3 billion check is deposited—and wants to put an end to the entire episode, as do the General Creditors and Texaco management. The releases assure that all litigation relevant to this affair will be put to rest, a result desired by Pennzoil, which might be subject to pre-trial discovery as well as real or fancied claims

for contribution on the part of defendants in derivative actions.

*Kirk*, 82 B.R. at 684.

Moreover, as noted in Mr. Kerr's earlier-cited testimony, Pennzoil sought the Release Provisions to finally and forever end "additional litigation that could drag on for years and that could *affect the ability of Texaco to finance a settlement.*" Tr. at 217 (emphasis added). Appellants conveniently omit mention of the fact that Mr. Liedtke, under intense examination by appellants' counsel, also testified as to this point:

> Q  Mr. Liedtke, is it your view that the releases helped foster a settlement between Texaco and Pennzoil?
>
> A  Yes, it is.
>
> Q  Is it because the releases gave Texaco officers or directors some comfort that they could settle without fear of reprisal?
>
> A  That, as I have tried to testify to earlier and have said in my deposition, was a reason, but it was not the major reason.
>
>   The major reasons had to do with terminating once and for all all of this endless litigation *and to make it possible for this entire arrangement to be financed by Texaco.*
>
>   Those were much more important considerations and above all to get the cooperation and endorsement of the Equity Committee and the Creditors Committee.

Tr. at 230–31 (emphasis added). *See also* Disclosure Statement § VII.E.1., at 30 (noting that "General Committee [of Unsecured Creditors] and Pennzoil believed [the Release Provisions were] necessary to the financeability of the Plan").

In the face of this unequivocal and uncontradicted testimony, it is simply untenable to suggest that we could excise the Release Provisions without affecting the settlement and, *ipso facto*, the now-confirmed and consummated reorganization. To the contrary, the Release Provisions are an integral part of the settlement, sought by Pennzoil (1) to protect itself from future

litigation, (2) to help ensure Texaco's financial ability to satisfy the settlement, and (3) to secure the support of the equity and creditors' committees for the Reorganization Plan. We don't doubt that Texaco's management, motivated in part by a healthy dose of self-interest, was eager to embrace Pennzoil's insistence on the Release Provisions. That fact alone, however, does not detract from the primacy of Pennzoil's insistence.

Unlike the attorney's fees in *AOV Industries*, the Release Provisions here strike at the very heart of the compromise and settlement in this case. Their rescission would undermine the entire reorganization, creating, it seems to us, a nightmarish situation for the bankruptcy court on remand. *See Roberts Farms*, 652 F.2d at 797 (holding that where "the property transactions [on appeal] do not stand independently and apart from the plan of arrangement ... [reversal in the absence of a stay] would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court"); *Miami Center Ltd. Partnership*, 838 F.2d at 1555–56 (quoting *AOV Industries*, 792 F.2d at 1149) (discouraging "'piecemeal dismantling' of a reorganization plan * * * [where] the consequences of what debtors seek strike at ... the reorganization plan as a whole").

Moreover, we underscore that, pursuant to the Release Provisions, Texaco has withdrawn with prejudice its petition for a writ of *certiorari* before the Supreme Court.[14] The parties to this appeal agree that Texaco cannot now retrieve that right. Although the petition was concededly a thin reed on which to rest the future of the company, the simple fact is that Supreme Court review of the Pennzoil Judgment was Texaco's legal "last stand." To rescind the Release Provisions now and allow

the derivative actions to go forward, or for new ones to be filed in their stead, would be manifestly unjust under these circumstances.[15]

Appellants assert that it was the very prospect of Texaco continuing the "litigation with Pennzoil, 'betting the ranch' on an unlikely grant of *certiorari* by the United States Supreme Court," which precluded the Icahn Group from seeking a stay in this case. Appellants' Reply Brief at 2. Indeed, Texaco advised shareholders that there were three alternatives to confirmation and consummation of the Plan: continuing the litigation (*i.e.*, petitioning for a writ of *certiorari* from the Supreme Court), seeking alternative plans, or liquidation. Disclosure Statement § XI, at 45–46. At the same time, it was emphasized throughout the Disclosure Statement that the *"certiorari* strategy" was inherently risky. *See* Disclosure Statement § VII.E.1., at 31 (suggesting that "catastrophic results" would ensue if Supreme Court denied *certiorari*); *id.* § XII, at 47 (noting "the substantial risks involved in pursuing Supreme Court review"). The Icahn Group contends that it took seriously this "threat" to continue the litigation and that, consequently, a stay pending appeal was not a viable option.

Appellees note that the "effective date" (the day on which consummation would begin) would not occur until fifteen days after the Confirmation Order had been entered *and had not been stayed*. Disclosure Statement § VII.F., at 39. Moreover, Texaco plainly stated that if no stay was sought pending appeal, it intended to argue that any such appeal would be moot. *Id.* § VII.D.8., at 27. Yet, despite this "plain speaking" and the availability of the fifteen-day window in which a stay could be sought, the Plan was conditioned on two

---

**14.** Texaco, to protect its interests, had filed its petition for a writ of *certiorari* on or about the March 31, 1988 deadline.

**15.** Certain protections were built into the Plan should the Confirmation Order, following consummation in the absence of a stay, be modified or reversed on appeal. Under such circumstances, it was agreed that, "rather than being faced with the risk of a non-appealable Pennzoil

Judgment, Pennzoil's Judgment Claim in Texaco's Reorganization Case will be limited to and can be satisfied by a cash payment in [the amount of $3 billion]." Disclosure Statement § VII.D.8., at 27. Pennzoil, however, would be allowed to vote its claim in full in subsequent Chapter 11 proceedings. *Id.* In our view, this provision mitigates but does not whitewash the inequities created by reversal at this time.

important things: (1) the effective date must have in no event occurred later than April 14, 1988, and (2) the Supreme Court must not have granted or denied *certiorari.* *Id.* § II., at 6; *id.* § VIII.F., at 39. Despite these considerations, appellants' case is not advanced.

Had appellants sought a stay and been denied that option, the equities would cut more favorably in appellants' favor. Instead, we are left to hypothesize as to how a hypothetical request for a stay would have been argued, what accommodations might have been contrived, and what impact all of this truly would have had on the Reorganization Plan. Indeed, the references to a stay in the Disclosure Statement, and Texaco's forthright assertion that it would seek dismissal of any appeal in which a stay had not been obtained, obviously imply that a stay application was contemplated should there be an appeal. Further, the Plan suggests that an accommodation was at least possible by allowing one or more of the conditions precedent to consummation to be "waived in writing by each of the Proponents acting jointly and unanimously...." Disclosure Statement Exh. A, at A–20 (Art. X.F. of the Plan). At minimum, appellants were obliged to explore this and other possibilities in an effort to protect this appeal from being mooted.

A somewhat analogous situation presented itself in *Central Transport.* In that case, a bankruptcy court granted a stay of a confirmation order pending appeal, but conditioned the stay upon the appellant posting a $7 million supersedeas bond. The appellant failed to do so, and the Plan was consummated. In affirming dismissal of the appeal as moot, the Fourth Circuit noted:

> We can understand a reluctance to put up a supersedeas bond of $7 million, but if the [appellant] seriously sought an out-

right reversal of the order of confirmation, as it contends, it should have posted the bond or sought a substantial reduction in its amount; it should not have sat idly by while this case drifted along a routine, unexpedited course.

*Central Transport,* 841 F.2d at 95. Although appellants here profess that they do not seek an outright reversal of the Confirmation Order, we already have found that the relief sought goes to the very core of the Reorganization Plan and cannot be severed. Consequently, the equities here are no more in favor of the Icahn Group than they were for the appellant in *Central Transport* who was asked to post a rather prodigious bond if appellate rights were to be preserved. At minimum, the Icahn Group should have sought a stay or otherwise tried to protect its interests by placing this appeal on an expedited track. Having failed to even attempt that course, and with Texaco's position and those of so many third parties now radically changed in reliance on the Confirmation Order, the equities cut decisively against this appeal. *Revere Copper and Brass,* 78 B.R. at 23.

Appellants wanted the Plan confirmed and voted for confirmation. They did not wish to risk the benefits of confirmation by staying an essential element of the Plan. Having achieved their major goal, they now seek the best of both situations. We find as a matter of both law and equity that appellants' failure to seek a stay moots this challenge.[16]

### 2. The Change–in–Control Clause

■ In addition to mootness concerns related to constitutional and jurisprudential considerations, the Change–in–Control Clause faces a statutory mootness challenge as well. The Financing Agreement was authorized by the bankruptcy court pursuant to 11 U.S.C. § 364(c). The Bankruptcy Code expressly provides that credit

---

**16.** We note that the Plan includes a severability clause (Article X.D.). Appellants' reliance on this clause in support of their argument to sever at this stage, however, is misplaced. The clause provides that "[s]hould the Bankruptcy Court determine, *prior to the Confirmation Date,* that any provision of the Plan is either illegal on its

face or illegal as applied," then that provision may be severed without affecting any other aspect of the Plan. Disclosure Statement Exh. A, at A–19 (emphasis added). Confirmation has long since passed and, for the reasons stated above, it would be both impossible and inequitable to sever now.

authorizations pursuant to that section may not be reversed or modified on appeal unless that authorization has been stayed pending appeal. 11 U.S.C. § 364(e) ("section 364(e)").[17] Thus, on statutory grounds, appellants' challenge to the Change–in–Control Clause must be dismissed.

◼ Appellants, however, contend that they do not seek to disturb the validity of either the Financing Agreement or the security interests granted thereunder and that section 364(e), therefore, is inapplicable. We doubt that such a crabbed reading of section 364(e) comports with Congress's intent. *See Burchinal v. Central Washington Bank (In re Adams Apple, Inc.),* 829 F.2d 1484, 1488 (9th Cir.1987) (holding that severance of cross-collateralization clause from financing agreement is prevented unless stay pending appeal obtained pursuant to section 364(e)). Regardless, we find that just as we could not sever the Release Provisions from the Reorganization Plan without disrupting the reorganization as a whole, we cannot sever the Change–in–Control Clause from the Financing Agreement without in turn undermining that agreement. Consequently, even if section 364(e) would allow the result urged by appellants (a decision we need not reach), the relief here sought cannot be provided and this challenge, therefore, must also be dismissed as moot.

Alan Buckwalter, Managing Director of Chemical Bank of New York (which is the administrative agent under the Financing Agreement), had supervisory responsibility for negotiating the Financing Agreement on behalf of the bank syndicate. He testified quite clearly that the Change–in–Control Clause was very much a part of the negotiated bargain between Texaco and the banks:

> Q During the course of that meeting [a meeting with Texaco officials about the terms of the financing agrement] did you present the position of the banks that were present?
>
> A Yes, I did. I was spokesman on behalf of the other banks.
>
> Q Was there a discussion with respect to the change of control clause?
>
> A Yes, there was.
>
> Q Would you relate to the Court what you said to the Texaco people in substance regarding the change of control clause?
>
> A In substance there were several critical issues. I said, first of all, that in order for this transaction to be syndicated and also in order for the—first of all, for the [lead banks] to commit any of our funds to this transaction, that we would have to have a change of control provision. . . .

Tr. at 329–30. Later in his testimony he referred to the Change–in–Control Clause as "an important and integral part of the overall transaction," Tr. at 336, adding that, as to the lead banks in the syndicate, the clause "was not negotiable." Tr. at 331.

Consistent with this testimony, David Crikelair, Texaco's Treasurer, testified as follows: "The issue of change of control is a new thing to us and these banks came on to us strong and pointed from the beginning and said, 'This is an absolute[,] mandatory[,] nonnegotiable requirement.'" Tr. at 304.

Appellants retort to this unequivocal testimony is that Texaco's management failed to even try to negotiate away this provision (an alleged violation of their fiduciary duties) and that the obvious urge toward self-preservation manifested in the clause calls into question whether it is "fair, or reasonable." *In re Crouse Group,* 71 B.R. at 551. As alluded to *supra* note 13, that

---

**17.** That section provides in full:

The reversal or modification on appeal of an authorization under this section [11 U.S.C. § 364] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

strategy puts the merits cart before the mootness horse.

Moreover, that Texaco did not more vigorously protest inclusion of this clause is not altogether surprising, since, as Buckwaltor noted, "To my knowledge, that was not an issue for Texaco, because it was an issue that the banks were adamant on." Tr. at 338.

That insistence was grounded in the banks' concerns, as articulated by Buckwaltor, that different management might "leverage the company beyond where we would like to see it. Leverage, and there is also the issue of who you are going to do business with, being comfortable with the way they manage their business, know thy borrower, a number of issues." Tr. at 344.

Appellants argue that this testimony lacks credibility because other provisions were expressly made part of the Financing Agreement which limit Texaco's ability to incur debt. The leverage concern, appellants thus argue, is a sham. Further testimony by Buckwaltor, however, when pressed on this very issue by appellants' attorney, reveals that the Change–in–Control Clause remained at all times an important part of the bargain.

Q  Isn't it true, Mr. Buckwaltor, that the covenants that are contained within the credit agreement could have provided for you the protections that you needed with respect to the type of leverage that concerns you?

A  Not when taken only as themselves, necessarily.

There have been many situations in my experience where covenants themselves have not been enough to protect lenders in a situation where management doesn't manage the assets properly.

Tr. at 344.[18]

It is apparent from this testimony that the Change–in–Control Clause was part of the bargained-for consideration. We cannot simply excise that provision and expect that the agreement resting upon it will not fall.

Indeed, we add that the Financing Agreement provides that modification or reversal of the bankruptcy court's authorization under 11 U.S.C. § 364(c) also constitutes a default and, at the lenders' discretion, gives rise to an acceleration of the $3 billion loan. Financing Agreement § VII(k), at 29 (Exh. # 21 at confirmation hearing). This underscores the inequity of granting the relief requested. Texaco, properly relying on the Confirmation Order in the absence of a stay, has made the $3 billion settlement payment. For us now to rescind the Change–in–Control Clause and invite acceleration would be, to say the least, an extremely onerous and inequitable penalty to impose on Texaco for its proper reliance on a final judgment issued by the bankruptcy court.

The question initially presented is whether we *may*, when confronted by a mootness hurdle, strike the Change–in–Control Clause, not whether we *should* do so. On this point, the testimony before us amply supports the bankruptcy court's conclusion that the bank syndicate insisted on the Change–in–Control Clause as a "non-negotiable feature." Tr. at 490. Consequently, we cannot effectively grant the relief requested. Under these circumstances, and even if section 364(e) does not bar this appeal, constitutional and equitable/jurisprudential considerations related to mootness mandate that this appeal also be dismissed in the absence of a stay.

### Conclusion

For all of these reasons, the Icahn Group's appeal must be dismissed as moot.

---

**18.**  We make note of the widely publicized proxy fight recently waged by Carl Icahn, including his offer to obtain a controlling share of outstanding Texaco stock at $60 a share. There was wide speculation, whether accurate or not, that, had Icahn been successful in his proxy fight and subsequent takeover bid, new management would have sold substantial Texaco assets to finance the takeover. Although one would naturally expect that the banks harbored a certain apprehension as to these possibilities, Buckwaltor expressly testified that, at the time the Change–in–Control Clause was negotiated, the banks were not fearful of an imminent hostile takeover by a given party. Tr. at 346.

To state the obvious, it would not be unreasonable to conclude that there is more to this challenge than a simple appeal of a confirmation order. Whatever future designs the Icahn Group may harbor for Texaco, fallout from the Texaco–Getty merger has been littering the economic landscape for the past four years. With this limited appeal mooted due to appellants failure to obtain a stay, it may finally be time for the parties to take their marbles and go home, closing out one of the most bizarre chapters of American legal and economic history.

DISMISSED.