In re BEST PRODUCTS CO., INC., et al., Debtors.

RESOLUTION TRUST CORPORATION, as receiver for Farwest Savings and Loan Association and ABQ Federal Savings Bank, Appellant,

v.

BEST PRODUCTS CO., INC., et al., Appellees.

Nos. 91 B 10048 (TLB) to 91 B 10053 (TLB) and 94 CIV 5388 (AGS).

United States District Court, S.D. New York.

Jan. 20, 1995.

---

Kronish, Lieb, Weiner & Hellman (Richard Lieb, Tara Hannon, of counsel), New York City, Resolution Trust Corp. (Joseph A. Guzinski, of counsel), Washington, DC, for appellant Resolution Trust Corp.

Weil, Gotshal & Manges (Harvey R. Miller, Marc D. Puntus, of counsel), New York City, for appellees/debtors.

Simpson Thacher & Bartlett (Robert A. Bourque, Lillian E. Kraemer, Melvyn L. Cantor, Frederic M. Brooks, of counsel), New York City, for appellees Bank Group.

Wachtell, Lipton, Rosen & Katz (Chaim J. Fortgang, Eric M. Roth, of counsel), New York City, for appellee Chemical Bank.

SCHWARTZ, District Judge:

The Resolution Trust Corporation (the "RTC") appeals from an order of the United States Bankruptcy Court for the Southern District of New York (Brozman, B.J.) ("the Bankruptcy Court") dated May 31, 1994 and docketed June 3, 1994 (the "Confirmation Order") confirming the Appellees'-Debtors' Joint Plan of Reorganization dated January 14, 1994 under chapter 11 of title 11 of the United States Code (the "Plan" and the "Bankruptcy Code", respectively). The Con-

firmation Order followed a comprehensive written decision in which the Bankruptcy Court, among other things, overruled the RTC's objections to confirmation of the Plan. *See In re Best Prods. Co.*, 168 B.R. 35 (Bankr.S.D.N.Y.1994) (the "Bankruptcy Court Decision"). The Confirmation Order was settled pursuant to the direction in the Bankruptcy Court Decision to "SETTLE ORDER consistent with this decision" (*id.* at 73) and the Bankruptcy Court Decision is incorporated into the Confirmation Order by reference. Confirmation Order at 3–4. The Appellees–Debtors and the Appellees–Bank Group[1] (collectively, the "Appellees") have moved to dismiss the RTC's appeal on the grounds that the appeal is moot since the RTC failed to seek a stay of the Confirmation Order, the Plan has been consummated and this Court cannot effectively or equitably fashion a remedy. For the reasons set forth below, the motion to dismiss is granted.

*BACKGROUND*

Certain background facts material to this decision are set forth in the Bankruptcy Court Decision; familiarity with the Bankruptcy Court Decision is assumed. The following facts are relevant to this Court's decision and are referred to as background. Unless otherwise indicated, these facts are uncontroverted.

*The Parties and the Chapter 11 Proceedings*

On January 4, 1991 (the "Commencement Date"), the Appellees–Debtors—Best Products Co., Inc. (a Virginia corporation) and its affiliates, BAC Holdings Group, Inc., Best Ashland, Inc., Best California, Inc., Best Products Co., Inc., (a New York corporation) and First Land & Development, Inc., (collectively, the "Debtors")—each commenced a case under the Bankruptcy Code. The chapter 11 cases were referred to the Honorable Tina L. Brozman, United States Bankruptcy Judge, and were procedurally consolidated and jointly administered pursuant to an order of the Bankruptcy Court. After the Commencement Date, the Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors' chapter 11 petitions were filed in the wake of a failed leveraged buyout ("LBO") which was commenced in late 1988 and consummated in early 1989. In connection with the LBO, the members of the Bank Group provided $622 million of senior financing that was partially secured but largely unsecured. Under the Plan, the claims of the Bank Group are allowed as unsecured claims in the amount of $322,653,717.

The RTC is the receiver for two failed depository institutions, FarWest Savings & Loan Association ("FarWest") and ABQ Federal Savings Bank ("ABQ"). FarWest, ABQ and other lenders provided junior financing pursuant to note purchase agreements which expressly provided that any payments on their notes would be "subordinate and subject in right of payment to the prior payment in full" of the Bank Group's senior indebtedness. The RTC, individually and as agents on behalf of FarWest and ABQ, filed separate proofs of claims against each of the Debtors based on the notes in the amount of approximately $34,000,000.

On December 29, 1992, the Debtors commenced adversary proceedings against the Bank Group, the RTC and numerous other participants in the LBO.[2] The Debtors' principal complaint challenged the loans made by the Bank Group, the RTC's predecessors and others as fraudulent conveyances pursuant to section 544(b) of the Bankruptcy Code (the "LBO Action"). The Debtors also sought to void certain payments to the Bank Group,

---

1. The Bank Group consists of Chemical Bank (as successor by merger to Manufacturers Hanover Trust Company), Industrial Bank of Japan, Ltd., The Nippon Credit Bank, Ltd., The Mitsubishi Bank Limited, Dresdner Bank A.G., The Asahi Bank, Limited (as successor to The Saitama Bank, Ltd.), Wells Fargo Bank, N.A., Eaton Vance Prime Rate Reserves, Credit Lyonnais and Van Kampen Merritt Prime Rate Income Trust.

2. Best commenced suit, at the time that it did so, to avoid having been precluded from prosecuting its fraudulent conveyance and preference actions. *See In re Best Prods. Co.*, 168 B.R. at 45 n. 22.

the RTC and others as voidable preferences under section 547 of the Bankruptcy Code.[3]

*The Plan and the Objections to the Plan*

In January 1994, the Debtors proposed the Plan and filed a disclosure statement under section 1125 of the Bankruptcy Code with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement was approved by order of the Bankruptcy Court dated January 14, 1994 and a confirmation hearing was scheduled for March 16, 1994 on the Plan.

As detailed in the Bankruptcy Court Decision, the Plan—the fifth proposed plan of reorganization filed—was the product of years of arduous arm's-length negotiations between the Debtors and various creditor constituencies. The settlement of the LBO Action (including as against the RTC), as well as the settlement of the preference action against the Bank Group (the "Bank Preference Action"), are contained in the Plan (collectively, the "Settlement"). In approving the Settlement as "fair and equitable and well within the range of reasonableness", the Bankruptcy Court considered, among other things:

the issues, both legal and factual, raised by the proponents and opponents of the set-

tlement; the impediments to a recovery by Best in the LBO Action; the cost of further litigation both as a dollar figure and as a distraction to a company either remaining in or just emerging from chapter 11; the proportion of the creditors who have voted in favor of the plan; the relative benefits to be received by the estate from the settlement; the nature and breadth of the releases to be issued; and the circumstances surrounding the negotiation of the settlement and plan.

*In re Best Prods. Co.*, 168 B.R. at 47–64.[4] Significantly, the Bankruptcy Court unambiguously found that the Settlement was one of the "cornerstones" of the Plan. *Id.* at 60, 72. This finding is clearly supported by the Disclosure Statement and the Plan.

Under the Plan and the Settlement, in exchange for a dismissal with prejudice of the Debtors' adversary proceedings against the Bank Group, the Bank Group agreed to release its security interests in certain of the Debtors' property and to permit the reallocation to the Debtors' general unsecured creditors of $23 million dollars in cash and $8 million dollars in equity.[5] The Bankruptcy Court observed:

the Bankruptcy Court observed, section 1123(b)(3)(A) of the Bankruptcy Code specifically permits a plan to provide for the settlement of any claim belonging to the debtor or the debtor's estate. *In re Best Prods. Co.*, 168 B.R. at 50. Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same. The settlement must be fair and equitable and in the best interests of the estate. *Id.* (citations omitted). One of the factors that the Bankruptcy Court should review in determining whether to approve a settlement is whether the debtor's creditors affirmatively support, or do not object to, the settlement. *Id.* Here, where the creditors voted to support the Plan—one of the cornerstones of which was the Settlement— support for the Settlement is apparent and need not be inferred from the lack of objections thereto. *Id.* at 60.

3. The RTC moved to dismiss the LBO Action and the preference action brought against the RTC (the "RTC Preference Action") for lack of subject matter jurisdiction and requested that the district court withdraw the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d). The district court held that the bankruptcy court had subject matter jurisdiction and declined to with-. draw the reference. *Best Prods. Co. v. Resolution Trust Corp. (In re Best Prods. Co.)*, Nos. 93 Civ. 1115 (CSH) and 93 Civ. 1149 (CSH), 1994 WL 141970 (S.D.N.Y. April 20, 1994). The Settlement does not provide for settlement of the RTC Preference Action. *In re Best Prods. Co.*, 168 B.R. at 47.

The RTC also commenced an adversary proceeding with respect to the subordination agreements (the "RTC Action"). The RTC subsequently moved in the District Court to withdraw the reference as to the RTC Action and that motion is *sub judice* before the Honorable Robert P. Patterson. The Bank Group has informed the Court of its intention to move to dismiss the RTC Action on the grounds of res judicata. The Debtors do not take any position with respect to the preclusive effect of the Confirmation Order on the RTC Action.

4. The Settlement was appropriately approved in conjunction with the confirmation hearing. As

5. The Bank Group's submissions to this Court value their "give-up" as between $31 million and $40 million. This difference is apparently based on an alternative valuation that is predicated upon the assumption that the Bank Group would

If [the settlements of the LBO Action and the Bank Preference Action] are approved, the Banks, in exchange for the Best's agreement not to challenge their claim of roughly $322.7 million, will release liens and security interests granted in connection with the merger financing and the September 1990, refinancing (the latter being the subject of the Bank Preference Action). In addition, the Banks have agreed to release any claims based upon guarantees made by subsidiaries of Best. Lastly, the Banks have agreed to shift to other classes distributions of roughly $23 million in cash and $8 million in equity. The Banks are not releasing or waiving the benefits of any contractual subordination held by them as against the Objectants [which include the RTC].

*In re Best Prods. Co.*, 168 B.R. at 47.

More specifically, the distributions to classes 6 (Mutual Life Insurance Company of New York), 13 (holders of industrial revenue bonds) and 14 (general unsecured creditors) "reflect the benefits realized by enforcement of the subordination provisions (which the Objectants oppose) as well as the proposed compromises and settlements" with the Bank Group and others. *Id.* at 48 (citations omitted). As the Bankruptcy Court explained:

[t]he proposed LBO settlement allows Best to sweeten the distributions to class 13 (who hold industrial development bonds) by roughly 7.5% ($2.5 million), to the class 14 claimants (the general unsecured creditors) by over 12% ($42 million), ... and to class 6 by 7.24% ($36 million). The source of these added distributions, as discussed above, is MetLife, which is foregoing 12.4% of its distribution ($10 million), and the Banks, which *inter alia*, are contributing roughly 10% of their distribution ($31.5 million).

*Id.* at 48 (citations omitted).

The Plan also enforces the subordination agreements among creditors pursuant to section 510 of the Bankruptcy Code by directing that cash and shares of new common stock of the reorganized Debtors otherwise distributable to subordinated claimants be distributed to the beneficiaries of the subordination agreements. As a consequence, the RTC, as the receiver for two subordinated creditors, did not receive any recovery under the Plan other than the with prejudice termination of the LBO Action that was brought against the RTC and other defendants.

Critically, the Bankruptcy Court found that the Bank Group would not have supported the Plan, which included the Settlement, unless the Plan provided for the enforcement of the subordination agreements. The Bankruptcy Court observed that, the Bank Group "adamantly refused to entertain any plan that would give a distribution to the subordinated creditors in variance with the subordination agreements." *In re Best Prods. Co.*, 168 B.R. at 47; *see also id.* at 62 (the Bank Group "objected to Best's depriving them of their subordination benefits and insisted on the enforcement of the contractual subordination agreements"). The RTC's memorandum of law in opposition to Appellees' motion recognizes that enforcement of the subordination agreements was critical to the Bank Group's support of the Plan. Brief of Resolution Trust Corporation in Opposition to the Appellees' Motion to Dismiss This Appeal ("RTC's Brief") at 4 ("From the outset, the Banks demanded all of the stock distributable on the RTC-held notes, claiming a right to enforcement of subordination; the Debtor went along with the Banks' demand in order to get their agreement to a plan of reorganization"). Despite the foregoing, at oral argument on the instant motion, the RTC not only challenged as clearly erroneous the Bankruptcy Court's findings that enforcement of the subordination agreements was integral to the Plan, but questioned whether the Bankruptcy Court had made such findings. *See* Transcript of Oral Argument held on December 16, 1994 ("Tr.") at 65–67.

Creditor support for the Plan was overwhelming. *In re Best Prods. Co.*, 168 B.R. at

---

prevail in the Bank Preference Action. Judge Brozman analyzed the merits of the Settlement using the more conservative valuation. *In re . Best Prods. Co.*, 168 B.R. at 60, n. 34. Whether the amount of the Bank Group's "give up" is $23 million in cash and $8 million in equity or something more is inconsequential to the merits of this appeal.

48, 60. The only parties contesting confirmation of the Plan and approval of the Settlement were the RTC, First Fidelity Bank & Trust Company, as Indenture Trustee ("First Fidelity") and, as a group, Rockefeller Group Capital Corporation, The Bishop Estate and AmSave Credit Corporation (the "Rockefeller Group"). All of the objecting parties received no distribution under the Plan as a result of the enforcement of the subordination agreements. The objecting parties challenged the confirmation of the Plan on the grounds, *inter alia*, that (1) the Settlement was unreasonable, and (2) the Plan impermissibly enforced the subordination agreements. The objections occasioned an eight-day evidentiary hearing under section 1129 of the Bankruptcy Code.

On May 25, 1994, the Bankruptcy Court issued its decision (as modified by an errata order dated May 27, 1994) overruling the objections of the RTC, First Fidelity and the Rockefeller Group. *See In re Best Prods. Co.*, 168 B.R. 35. The Bankruptcy Court Decision set forth extensive findings of fact and conclusions of law with respect to confirmation of the Plan, the enforcement of the subordination agreements [6] and approval of the Settlement and other compromises and settlements, all as provided for by the Plan. The Bankruptcy Court Decision specifically addresses and rejects each of the objections that were interposed by the RTC, the Rockefeller Group and First Fidelity.

As noted above, by the Confirmation Order dated May 31, 1994 and docketed June 3, 1994, the Bankruptcy Court confirmed the Plan. As part of the Confirmation Order, the Settlement was approved and the subordination agreements were enforced.

*The Filing of the RTC Appeal*

The RTC timely filed a notice of appeal. *See* Bankruptcy Rule 8002. The RTC did not, however, attempt to seek a stay of the execution of the Confirmation Order or of the consummation of the Plan. Pursuant to an agreement among the parties and an oral order of this Court, Appellees' motion to dismiss on mootness grounds was to be briefed and determined prior to and separate from the merits of the appeal (assuming that the appeal was not dismissed). Accordingly, briefs were submitted with respect to Appellees' motion and oral argument was held on Appellees' motion on December 16, 1994.[7]

*Consummation of the Plan*

On June 14, 1994 (the "Effective Date"), the Plan became effective within the meaning of the Plan. In accordance with the Confirmation Order, on the Effective Date the Debtors commenced consummation and implementation of the Plan. It is undisputed that the Plan has been substantially consummated; indeed, the RTC agrees that the Plan has been consummated. Affidavit of Joseph A. Guzinski, Esq., an attorney with the RTC, sworn to September 8, 1994 ("Guzinski Affidavit") at ¶ 6; Tr. at 57. Substantial consummation is defined in the Bankruptcy Code as:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).

In connection with the consummation of the Plan, the Debtors represented in their

---

6. The Bankruptcy Court determined, among other things, that the Debtors had met their burden of proof as to the existence and validity of the subordination agreements. *In re Best Prods. Co.*, 168 B.R. at 70. In reaching this conclusion, the Bankruptcy Court noted that the RTC had opted to argue that the Bankruptcy Court lacked jurisdiction to resolve the subordination issue (an argument rejected by the Bankruptcy Court) instead of adducing evidence on the merits. *Id.*

7. After Appellees' motion was fully submitted the Court accepted and considered the following submissions in connection with the motion: let-

ter dated December 9, 1994 from Richard Lieb, Esq. (attorney for the RTC); letter dated December 14, 1994 from Robert A. Bourque, Esq. (attorney for the Bank Group); RTC's Additional Brief in Opposition to the Appellees' Motions to Dismiss the Appeal dated December 14, 1994; the Debtors' Additional Memorandum of Law in Support of Motion to Dismiss the Appeal dated December 14, 1994; letter dated January 4, 1995 from Harvey R. Miller, Esq. (attorney for the Debtors); and letter dated January 12, 1995 from Richard Lieb, Esq.

initial moving papers (and the RTC has not challenged) that the following distributions and transactions have occurred:

a. *Cash Distributions.* On the Effective Date, Reorganized Best distributed approximately $39 million in cash to approximately 4,350 holders of administrative expense claims, tax claims and unsecured claims.

b. *Distributions of Stocks and Warrants.* On the Effective Date, Reorganized Best issued in excess of 29 million shares of its common stock and more than two million warrants to purchase such stock to approximately 1,572 holders of unsecured claims....

c. *Actions Relating to the Issuance of the Common Stock.* In order to effect the distribution and subsequent transfer of its common stock, Best retained Bank of Boston as its transfer agent. Best also retained Morgan Walke as its investor relations firm. Other firms, including Wheat First Securities, "make a market" in the common stock of Best.

d. *Listing Common Stock.* In accordance with the provisions of the Plan and as a result of the conversion of Best from a privately held company to a publicly held company, Best has filed with the Securities and Exchange Commission (the "SEC") a Form 10. The Form 10 has become effective and Reorganized Best is currently an SEC-registered company. The common stock of Reorganized Best is listed on NASDAQ.

e. *Distributions of Promissory Notes.* On the Effective Date, Reorganized Best issued promissory notes to four of its secured creditors and delivered various agreements and instruments relating thereto and various mortgage liens and encumbrances were recorded. The notes issued to those creditors prior to the Commencement Date were returned by such creditors to the Debtors and cancelled.

f. *Appointment of a New Board of Directors.* On the Effective Date, a new board of directors for Reorganized Best was appointed. The Board of Directors consists of seven directors including the Chief Executive Officer and six other persons who were not previously associated with Best. The new Board is meeting and functioning.

g. *Merger and Dissolution of Entities.* On the Effective Date, four of the Debtors—BAC, Best California, Inc., First Land & Development, Inc. and Best Products Co., Inc. (a New York corporation)—and several non-debtor subsidiaries of Best were merged into Reorganized Best or dissolved.

h. *Termination of Debtor in Possession Financing.* On the Effective Date, the Debtors terminated their debtor in possession financing agreement, pursuant to which a syndicate of financial institutions led by Chemical Bank had agreed to provide loans and issue letters of credit in an amount equal to $200 million to Best during the pendency of the chapter 11 cases.

i. *Exit Financing.* On the Effective Date, to replace the debtor in possession financing, Reorganized Best entered into a $150 million credit facility with a different syndicate of financial institutions led by Bankers Trust Company to provide financing and letters of credit for use in the operation of Reorganized Best (the "Exit Financing Facility"). Letters of credit in the aggregate face amount of $98,762,043 are currently outstanding pursuant to the Exit Financing Facility.

j. *Dismissal of Actions Pursuant to the Plan and Settlements Embodied Therein.* On or about the Effective Date (i) the LBO Action was dismissed with prejudice, (ii) an adversary proceeding commenced by the Debtors under sections 547 and 551 of the Bankruptcy Code to avoid as a preference the granting of security interests to the Banks in certain inventory of Best (the "Bank Preference Action") was dismissed with prejudice and (iii) the motion of Metropolitan Life Insurance Company ("MetLife"), the Debtors' largest secured creditor with a claim as of the commencement date of approximately $223 million, for relief from the automatic stay or adequate protection was dismissed with prejudice in accordance with a settlement agreement between Best and MetLife which was em-

bodied in the Plan and approved pursuant to the Confirmation Order.

k. *Consummation of Approved Compromises and Settlements and Execution and Delivery of Releases with Respect to the LBO.* On the Effective Date, the Debtors and numerous other parties to the LBO Action executed and delivered hundreds of releases (in the aggregate) generally releasing each other of all claims relating to Best and the LBO. As part of the approved compromise and settlement of Best's claims against the Banks, a portion of the consideration that the Banks otherwise would have received as unsecured creditors, approximately $31.5 million to $40 million, was redirected to the holders of certain unsecured claims against the Debtors.

l. *Reinstatement of Claims.* On the Effective Date, certain claims against the Debtors were reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

m. *New Credit Terms.* Since the Effective Date, numerous trade creditors of Reorganized Best have provided enhanced trade credit terms to Reorganized Rest in reliance on Best's emergence from chapter 11. Reorganized Best relies on the provision of enhanced credit terms and commitments to provide inventory for the production of its catalog. An adequate supply of inventory is also vital to Reorganized Best's performance, particularly during its critical Christmas shopping season.

n. *New Leases.* Since the Effective Date, Reorganized Best has entered into leases and related contracts relating to the opening of new stores....

o. *Accounting Changes.* On the Effective Date, Best began to implement the fresh start accounting rules with respect to its financial statements. In addition, Best's independent accountants revised the auditor's letter for Best to delete its qualified opinion of Best which was based upon Best's status as a chapter 11 debtor. That letter is provided with Best's financial statements to creditors and other interested parties in connection with potential extensions of credit and investments....

p. *Management.* On the Effective Date, Reorganized Best entered into new employment agreements with 11 of its executive officers and issued stock options to officers and other employees of Best.

Affidavit of Harvey R. Miller, Esq. sworn to August 16, 1994 at ¶¶ 18(a)–18(p).

The Debtors updated and augmented the foregoing list in their Additional Memorandum of Law in Support of Motion to Dismiss the Appeal dated December 14, 1994 ("Debtors' Additional Memorandum"); the RTC has not challenged these representations. Specifically, the Debtors informed the Court of the following additional transactions:

a. *Common Shares Traded.* Through December 12, 1994, approximately 19,300,-000 shares of new common stock of Reorganized Best have traded on NASDAQ since the Effective Date and the shares continue to trade.

b. *Filing of Form S–1.* On November 8, 1994, Best filed a Form S–1 Registration Statement with the Securities Exchange Commission providing for the registration of the shares of common stock issued to Chemical Bank.

c. *Interest and Amortization to Secured Creditors Pursuant to the Best Plan.* Reorganized Best has paid approximately $4,860,000 in interest and $198,148 in principal to secured creditors since the Effective Date.

d. *Taxes Paid Pursuant to the Best Plan.* Since the Effective Date, Reorganized Best has made approximately $1,600,000 in installment tax payments pursuant to the Best Plan.

e. *Sales Volume.* Through November 26, 1994, Reorganized Best's gross sales are approximately $643,000,000 since the Effective Date.

f. *Merchandise Orders.* Through December 9, 1994, Reorganized Best has received merchandise orders aggregating over $400,000,000 since the Effective Date.

g. *Expenses and Accounts Payable.* Through December 9, 1994, Reorganized Best has paid expenses payable of approximately $147,000,000 and accounts payable

of approximately $507,000,000, since the Effective Date.

h. *New Contracts.* Since the Effective Date, Reorganized Best has entered into (i) leases for eleven new catalog showrooms, (ii) ten lease amendments, (iii) two subordination, nondisturbance and attornment agreements, (iv) two lease termination agreements, (v) three memoranda of lease or other miscellaneous real estate agreements, (vi) twelve capital leases for equipment, two operating equipment leases and six equipment maintenance contracts, (vii) three software development/consulting contracts, (viii) an agreement for Christmas television advertising and a contract for advertising consulting services, (ix) various defective goods, incentive program and consignment agreements with its vendors, (x) a consulting agreement with a national accounting firm, (xi) a real estate consulting agreement, (xii) a warehouse and distribution consulting agreement, (xiii) numerous other non-material contracts—*i.e.*, contracts with a term of less than one year or an aggregate value under $20,000 and (xiv) numerous freight contracts for the shipment of goods.

i. *New Stores.* Since the Effective Date, Best has announced the opening of six catalog showrooms in 1995.

j. *Employees Hired.* Through December 12, 1994, Reorganized Best has hired 8,371 new employees since the Effective Date.

k. *Taxes Paid.* Since the Effective Date, Reorganized Best has (i) paid approximately $3,100,000 in real estate taxes, (ii) paid approximately $1,500,000 in personal property taxes, (iii) accrued or paid approximately $20,000,000 in payroll taxes and (iv) paid approximately $39,200,000 in sales and use/miscellaneous license taxes.

j. *Liens and Encumbrances Granted.* Excluding liens granted pursuant to the Best Plan, since the Effective Date Reorganized Best has granted (i) approximately 160 liens pursuant to UCC financing statements for cash registers and other computer equipment, (ii) approximately 90 liens pursuant to informational UCC financing statements for jewelry products placed in stores on a consignment basis and (iii) approximately six liens in conjunction with real estate transactions.

Debtors' Additional Memorandum at 3–4. The foregoing demonstrates beyond doubt that the Plan has been substantially consummated and that the Debtors are operating as reorganized entities engaging in extensive operations and transactions.

*The Substance of the RTC Appeal*

While the scope and substance of an appeal as a rule is defined early on and thereafter processed within well established parameters, the scope and substance of the RTC appeal has been, at best, fluid. The RTC's Notice of Appeal dated June 10, 1994 ("Notice of Appeal") unambiguously appeals from the Confirmation Order.[8] The RTC's Statement of Issues to be Presented on Appeal dated June 20, 1994 ("RTC's Statement of Issues") reflects the RTC's intention to appeal from the Confirmation Order which, among other things, approved the Settlement and provided for enforcement of the subordination agreements.[9]

---

**8.** RTC's Notice of Appeal provides:

[the RTC] hereby appeals to the United States District Court for the Southern District of New York from the final order of the Honorable Tina L. Brozman of the United States Bankruptcy Court for the Southern District of New York dated May 31, 1994 and entered on June 3, 1994, confirming the Debtors' Fourth Amended Plan of Reorganization dated January 14, 1994 in the above captioned case.

Notice of Appeal.

**9.** The RTC's Statement of Issues reflect that the RTC's intention—at least on June 20, 1994—was to appeal the Confirmation Order and that the RTC's appeal was not merely limited to an inter-creditor dispute between the RTC and the Bank Group relating to the provisions of the Confirmation Order that provide for enforcement of the subordination agreements. The first two issues presented in the Statement of Issues are illustrative:

1. Did the Bankruptcy Court err by approving the Settlement of the Debtors' lawsuit against the Banks based upon fraudulent conveyance laws to avoid the Banks' loan claims (the "LBO Bank Debt") arising out of the 1988/89 leveraged buyout ("LBO") of Best Products Co., Inc. ("Best"), and by confirming the Plan which contractually enforced subordination of the RTC–held notes based upon the release under the Settlement [defined as the

However, in connection with this motion to dismiss, the RTC has apparently sought to narrow the scope and substance of its appeal (or, at least, its characterization). For example, the *Guzinski Affidavit* provides:

> The portion of the Order appealed from is the part that enforces subordination as against RTC and in favor of the Banks pursuant to a subordination agreement (the "Subordination Agreement"), . . . despite the absence of an adjudication that the Banks are entitled to an order enforcing subordination of approximately $28 million of RTC-held notes in favor of $322 million of notes held by the Banks. . . .

*Guzinski Affidavit* at ¶ 3; *see also* Tr. at 59, 102 (on appeal the RTC is only seeking reversal of paragraph 7 of the Confirmation Order, which provides "[p]ursuant to section 510(a) of the Bankruptcy Code, the Plan enforces the subordination agreements . . .").

The essence of the RTC's objection to the Confirmation Order is that the Bankruptcy Court could not enforce the subordination agreements until there was a judicial determination on the merits (as opposed to a summary proceeding) of whether the Bank

Group's claims were due. Specifically, the RTC objects to the Bankruptcy Court's holding that "[s]ince [it] approved a settlement pursuant to which the Banks are left with a claim, the subordination agreements are enforceable." *In re Best Prods. Co.*, 168 B.R. at 70. Further, the RTC argues that if there was a fraudulent conveyance to the Bank Group, as alleged by the Debtors in the LBO Action, the Bank Group's claims would not be due and that the Bankruptcy Court's approval of the settlement of the LBO Action is not a substitute for a judicial determination by a court. Moreover, according to the RTC, this determination could not be made by the Bankruptcy Court because, the RTC argues, despite the fact that the RTC filed proofs of claim, the Bankruptcy Court does not have jurisdiction to enforce the subordination agreements and to decide this alleged contractual dispute between two creditors.[10]

The RTC further asserts that its appeal will not affect the consummated Plan and is a controversy between creditor-third parties, independent of the reorganization, and that a determination of that dispute on RTC's appeal to this court will not undo, or

---

settlement set forth in the Plan] of Best's claims to avoid the LBO Bank Debt since (a) RTC objected to approval of the Settlement on the grounds that (i) it was not fair and equitable, (ii) the process that led to the making of the Settlement was improper in light of the representation by the Debtors' attorneys of the sponsor of the LBO in making the LBO and of Best in incurring the LBO Bank Debt, and (iii) the Debtor sought a settlement with the Banks as a means to conclude its chapter 11 case rather than to effect a recovery by means of a settlement of its fraudulent conveyance claims, and (b) the LBO Bank Debt was accorded contractual priority over the RTC–held notes by the Plan's enforcement of a subordination agreement based on approval of the Settlement and without an adjudication that the LBO Bank Debt was not avoidable as a fraudulent conveyance, as previously contended by the Debtors?

2. Did the Bankruptcy Court err by approving the Settlement and by approving the Debtors' release of their fraudulent conveyance claims against the Banks, because the terms of settlement were not fair and equitable in light of (a) substantial evidence that the financial projections utilized in the LBO and their underlying assumptions, were inadequate and that the LBO left Best insolvent and without

adequate capital, (b) the unreasonably small amount provided for by the Settlement, and (c) the Examiner's uncontested conclusion that Best had a 40% to 60% likelihood of success on its fraudulent conveyance claims against the Banks?

10. The *Guzinski Affidavit* summarizes the RTC's position:

> A basic position of RTC on the merits is that the Banks are not entitled to an order enforcing contractual subordination under the applicable provision of the Subordination Agreement, which provides for subordination only if the Banks' claims are "due". . . . In that connection, the Debtor had brought suit against the Banks predicated on fraudulent conveyance laws to avoid their $322 million of notes. However, the debtor ultimately withdrew its lawsuit under a settlement with the Banks, and recognized the Banks' $322 million of note claims in full. . . . There has never been a determination whether the Banks' claims are indeed avoidable and hence not "due" within the meaning of the Subordination Agreement. In addition, RTC contends that the lower court lacked subject matter jurisdiction to order enforcement of contractual subordination as against RTC. . . .

*Guzinski Affidavit* at ¶ 4 (citations and footnotes omitted).

otherwise impact upon, the Debtor's consummated reorganization.

Guzinski Affidavit at ¶ 6. The RTC concludes that its appeal, which challenges the portion of the Confirmation Order that enforces subordination, is collateral to the Debtors' reorganization and, therefore, is not moot and Appellee's motion should be denied. *Id.* at ¶¶ 6, 8.

Furthermore, the RTC, in its Additional Brief in Opposition to the Appellees' Motion to Dismiss the Appeal dated December 14, 1994 ("RTC Additional Brief") and at oral argument, vigorously contend that the Settlement and the enforcement of the subordination agreements are separate elements in the Plan and were not intertwined and, therefore, that enforcement of subordination is severable from the Plan. The RTC's argument is premised, at least in part, on the fact that the section of the Plan that refers to the Settlement—section 4.12—is silent on subordination—which is discussed in sections 6.2 and 4.15. The RTC also relies on section 13.6(b) of the Plan which is set forth in the margin.[11] *See* Tr. at 77.

Moreover, as stated above, at oral argument the RTC challenged the Bankruptcy Court's finding that the Bank Group would not have supported a Plan that provided for a distribution to the RTC and other subordinated creditors as clearly erroneous and, further, questioned whether the Bankruptcy Court had even made such a finding. Tr. at 66–67.

Finally, the RTC asserts that it did not seek a stay because it did not intend to delay confirmation and that there was no need to seek a stay "with respect to enforcement of subordination because [the RTC's] position is that that issue is severable, it doesn't go to the heart of the reorganization, it would not unwind it." Tr. at 69. Indeed, counsel for the RTC suggested that, under the facts and circumstances of this appeal, seeking a stay would possibly have exposed it to sanctions under Rule 11 of the Federal Rules of Civil Procedure. Tr. at 95.

## DISCUSSION

### Enforcement of the Subordination Agreements is Integral to the Plan and Cannot Be Excised From the Plan

■ Even if the RTC has narrowed the scope of its appeal of the Confirmation Order to only paragraph 7 of that order, the Court rejects the RTC's argument that "[t]he issue on the merits poses what is tantamount to a two-party dispute that is outside the core of the reorganization accomplished under the Debtor's Plan." RTC's Brief at 6. The RTC's argument that if they were to succeed "[t]here would be no impact on the reorganization itself or on any of the creditors other than the Banks" is erroneous and is premised on the RTC's flawed perception of the relationship of the enforcement of the subordination agreements to the Plan. *Id.*

As detailed above, the Bankruptcy Court found that the Bank Group would not support the Plan (which included the Settlement as a cornerstone) without the enforcement of the subordination agreements. This finding—rendered after an eight day evidentiary hearing where a "small mountain of legal memoranda and documents" were submitted by the parties—is not clearly erroneous. *In re Best Prods. Co.*, 168 B.R. at 48.

There also can be no doubt that the enforcement of the subordination agreements was an essential element of the Plan which was inextricably interwoven with the Settlement and other elements of the Plan. Without the consideration provided by the Bank Group under the Settlement, the payments to the Debtors' general unsecured creditors contemplated by the Plan could not have been made. Indeed, the Bank Group in its briefs and at oral argument emphasized that the enforcement of subordination was a significant part of the *quid pro quo* of the Bank

---

11. Section 13.6(b) of the Plan provides:
    In the event that the Bankruptcy Court determines, *prior to the Confirmation Date,* that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.
    Plan at § 13.6(b) (emphasis added).

Group's agreement to reallocate a portion of its distributions to the Debtors' general unsecured creditors. Moreover, there can also be no doubt that the Settlement removed an impediment to the enforcement of the subordination agreements and, thereby, assured to the Bank Group an allowed claim. As the Bankruptcy Court specifically observed, since the Settlement left the Banks with a claim, "the subordination agreements are enforceable." *Id.* at 70.

Additionally, the RTC's last minute attempt to argue based on the contents of the Disclosure Statement and the structure of the Plan that these provisions are not interrelated is not only belied by the Bankruptcy Court's findings but also by the Disclosure Statement and the Plan. For example, the Disclosure Statement, under the heading "Essential Elements", provides that the enforcement of the subordination agreements and the compromise and settlements of certain claims (including the LBO Action and the Bank Preference Action) are *both* essential elements of the Plan. *See* Disclosure Statement at § VII(A).

The Court rejects the RTC's assertion that the offending portions of the Plan (those which enforce the subordination agreements) can be excised from the Plan. First, the Court does not read section 13.6(b) of the Plan as authorizing the excision of an essential element of the Plan. Indeed, that section of the Plan, by its terms, is limited to situations where the Bankruptcy Court determines *prior* to confirmation that a provision is invalid, void or enforceable and does not relate to a post-confirmation challenge to an essential element of the Plan. *See supra* n. 11. Moreover, section 1127(b) of the Bankruptcy Code provides that a plan cannot be modified after substantial consummation. 11 U.S.C. § 1127(b); *see also In re Joint E. & So. Dist. Asbestos Litig.*, 982 F.2d 721, 747–48 (2d Cir.1992), *modified,* 993 F.2d 7 (2d Cir.1993) (restructuring of trust was both substantive and significant and an impermissible modification of substantially consummated plan of reorganization). Thus, in light of the fact that the Plan has been consummated and the enforcement of the subordination agreements is an essential and interwov-

en element of the Plan, it cannot be excised at this stage. *See Manges v. Seattle–First Nat'l Bank (In re Manges)*, 29 F.3d 1034, 1043, n. 13 (5th Cir.1994) (rejecting argument that integral element of substantially consummated plan could be stricken without unraveling plan).

■ The relief requested by the RTC would, if granted, be tantamount to confirmation of a plan that is different than the one that was proposed by the Debtors and approved by 97% of the creditors. The court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment. *See In re Hudson & Manhattan R.R. Co.*, 332 F.Supp. 718, 721 (S.D.N.Y.1971) (court is not provided "with a clean slate upon which it may make alterations inconsistent with the plan itself"); *see also Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206–07, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code ... and the Code provides that it is up to the creditors—not the courts—to accept or reject a reorganization plan").

Simply put, *both* the enforcement of the subordination agreements *and* the settlement of the fraudulent conveyance litigation against the Bank Group (as embodied in the Settlement) were essential elements of the Plan and the Bank Group would *not* have supported the Plan absent these provisions. Memorandum of Bank Group in Support of Motion to Dismiss the RTC Appeal dated August 19, 1994 at 10. Moreover, these provisions are inextricably interwoven. Accordingly, if the Plan's enforcement of the subordination agreements were reversed on appeal, *the Plan would have to be voided.*

Further, the Plan has been consummated and thousands of transactions have been entered into by the reorganized Debtors and others post-consummation in reliance upon a consummated plan. Consequently, it would be impossible to restore the pre-consummation *status quo* and, therefore, even if the RTC was correct with respect to the merits of its appeal, fashioning effective relief would be both impossible as well as inequitable. As

(right)

a result, the RTC's appeal must be dismissed as moot.

*The Mootness Doctrine and the Stay Requirement*

■ As a threshold issue, the RTC argues that the Appellees were on notice of the RTC's intention to appeal and that this, therefore, relieved the RTC of its burden of seeking a stay. *See, e.g.,* Tr. at 70–71, 80; RTC's Brief at 15. The RTC's argument ignores that the burden was on the RTC, as the non-prevailing party, to ensure that its appeal did not become moot.

The mootness doctrine is premised on the fundamental jurisdictional tenet that Federal courts are empowered to entertain only cases and controversies. U.S. Const. art. III, § 2.

> [I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief to a prevailing party, the appeal must be dismissed by virtue of Article III's case and controversy requirement.... Within the bankruptcy context, an appeal should also be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.

*In re Chateaugay Corp.,* 10 F.3d 944, 949–50 (2nd Cir.1993) (*"Chateaugay II"*) (citations and internal quotations omitted). Thus, "[i]n bankruptcy proceedings, the mootness doctrine involves equitable considerations as well as the constitutional requirement that there be a case or controversy. These concerns often cannot be addressed separately; they are interactive, as the finality rule limits the remedies a court can offer." *Id.* at 952 (citations and internal quotations omitted).

Where a plan has been substantially consummated "there fairly exists a 'strong presumption' that appellants' challenges have been rendered moot due to their inability or unwillingness to seek a stay." *In re Texaco, Inc.,* 92 B.R. 38, 46 (S.D.N.Y.1988) (citations omitted). "This presumption is undergirded by the common sense notion that the 'piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions' is, in practical terms if nothing else, a virtually impossible task." *Id.* (quoting *In re AOV Indus., Inc.,* 792 F.2d 1140, 1149

(D.C.Cir.), *vacated in part on other grounds,* 797 F.2d 1004 (D.C.Cir.1986)); *see also In re Revere Cooper & Brass Inc.,* 78 B.R. 17, 21 (S.D.N.Y.1987) ("The policy reasons underlying the mootness doctrine is simply that where substantial elements of the reorganization plan have been implemented in the absence of a stay, any appeal of the confirmation order is moot because it is very doubtful that effective relief could be afforded.... Moreover, such a doctrine advances the policy of affording finality to the orders and judgments of the bankruptcy court") (citations and internal quotations omitted); *In re Chateaugay Corp.,* 988 F.2d 322, 325 (2nd Cir.1993) (*"Chateaugay I"*) (same).

Notably, while "[s]ubstantial consummation of a reorganization plan is a momentous event", "it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." *Chateaugay II,* 10 F.3d at 952; *see also In re Texaco,* 92 B.R. at 46 ("Substantial consummation in the absence of a stay, however, does not automatically discharge this court of its appellate jurisdiction. We remain bound to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole") (citations and internal quotations omitted).

The Second Circuit in *Chateaugay II* went on to explain that "[c]onstitutional and equitable considerations dictate that substantial consummation will not moot an appeal if *all* of the following circumstances exist":

> (a) the court can still order some effective relief, ...; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity, ...; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable uncontrollable situation for the Bankruptcy Court, ...; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings, ...; and (e) the appellant pursued with diligence all available remedies to ob-

tain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Chateaugay II,* 10 F.3d at 952–53 (citations and internal quotations omitted) (emphasis added).

Thus, while there is no absolute requirement in the Bankruptcy Code, or otherwise, to seek a stay of a confirmation order (as opposed to other orders such as pursuant to 11 U.S.C. § 363(m)), the law in this District and in this Circuit is that the failure to seek a stay of a confirmation order may render an appeal moot as a result of constitutional and equitable considerations. *See Chateaugay II,* 10 F.3d at 953 (substantial consummation will moot an appeal if the failure to pursue a stay with diligence "creates a situation rendering it inequitable to reverse the orders appealed from") (citations and internal quotations omitted); *In re Texaco,* 92 B.R. at 44 ("it may be incumbent upon a party appealing a bankruptcy court's ruling to seek a stay lest the appeal in question be rendered moot by constitutional or related equitable/jurisprudential considerations"); *In re Revere Cooper,* 78 B.R. at 23 ("it is obligatory upon an appellant from a confirmation order to pursue with diligence all available remedies to obtain a stay of the implementation of that order prior to the occurrence of comprehensive changes made in reliance on the unstayed order") (citations and internal quotations omitted). "The party who appeals without seeking to avail himself of [the protections afforded by Bankruptcy Rule 8005]

does so at his own risk." *Chateaugay I,* 988 F.2d at 326; *see also In re Public Serv. Co. of New Hampshire,* 963 F.2d 469, 473 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992) (dismissing appeal as moot where, "whether through oversight or 'procedural ineptitude,' ... appellants failed to 'pursue with diligence all available remedies to obtain a stay of execution of the objectionable order' ") (citations omitted); *In re Roberts Farms, Inc.,* 652 F.2d 793, 798 (9th Cir.1981) ("Appellants have failed and neglected diligently to pursue their available remedies to obtain a stay of the objectionable orders of the Bankruptcy Court and have permitted such a comprehensive change of circumstances to occur as to render it inequitable for this court to consider the merits of the appeal"); *In re Clarke,* 98 B.R. 979, 980 (9th Cir. BAP 1989), *appeal dismissed,* 914 F.2d 261 (9th Cir.1990) (recognizing the failure to attempt to obtain a stay pending appeal "as 'procedural ineptitude' in view of the unambiguous directions of Bankruptcy Rule 8005").

The RTC *did not even attempt to seek a stay* (despite the fact that the RTC had, in its own words, made the "considered" decision not to do so, notwithstanding that had it sought and obtained a stay, it would not have been required to post a bond in support of a stay pending appeal under Bankruptcy Rule 8005, *see* Tr. at 67–69). The RTC determined not to attempt to seek a stay, with full recognition that the Plan thereafter would be, and as the RTC has conceded was, substantially consummated.[12] As detailed above,

---

12. The Court rejects the RTC's argument that it was not required to seek a stay on the ground that such application would have been futile because of the absence of irreparable harm (since, the RTC urges, this appeal is nothing more than a two party dispute and the Bank Group can readily satisfy an award to the RTC). As to the showing to be made to support a stay pending appeal, *see, e.g., In re Hi-Toc Dev. Corp.,* 159 B.R. 691, 692 (S.D.N.Y.1993) ("(1) whether the stay applicant has made a strong showing ... on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies") (citations omitted). The RTC is represented here—and was represented in the Bankruptcy Court—by sophisticated counsel. Counsel could have fash-

ioned a showing to support a claim of irreparable injury in the absence of a stay pending appeal.

For example, under *Chateaugay II,* the absence of a request for a stay pending appeal is a significant factor on the issue of mootness "if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from". *Chateaugay II,* 10 F.3d at 952–53 (citations and internal quotations omitted). Although the threat of mootness alone is not dispositive of the issue of irreparable injury, it is a relevant factor. *See In re Moreau,* 135 B.R. 209, 215 (N.D.N.Y. 1992) (citations omitted); *see also In re Westwood Plaza Apartments, Ltd.,* 150 B.R. 163, 169 (Bankr.E.D.Tex.1993) (court considered danger that consummation of a plan may render HUD's claim moot as irreparable injury tilting in favor

numerous distributions were made and numerous transactions were entered into pursuant to the Plan. After the Plan was confirmed and/or consummated, numerous transactions were entered into by the reorganized Debtors with its creditors and third parties and the parties continue to perform as the transactions anticipated. For example, pursuant to the Plan: the Debtors have distributed millions of dollars in cash and stock; the Debtors have become a publicly-owned corporation with millions of shares of common stock issued and outstanding and those shares are being traded on the NAS-DAQ; the Debtors have entered into post-confirmation financing; liens have been released; numerous releases have been exchanged between the Debtors and the Bank Group and other defendants in the LBO Action; and litigations have been dismissed with prejudice. Critically, pursuant to the Plan and Settlement the Bank Group agreed to the reallocation of $23 million in cash and $8 million in securities to the Debtors' general unsecured creditors. Moreover, as a reorganized entity, the Debtors have entered into thousands of transactions with vendors, creditors and third parties who were strangers to the Plan (many, presumably, in reliance upon a confirmed Plan) with respect to, among other things, purchasing goods, hiring new employees, opening new stores and financial arrangements. Clearly, there has been a "comprehensive change in circumstances". *In re Revere Cooper*, 78 B.R. at 23 (citations omitted).

The RTC's assertion that the stock it seeks (or the equivalent value of that stock) is readily available to this Court ignores the critical fact that such stock cannot be equitably obtained without ordering the return of distributions from the Debtors' general unsecured creditors that received distributions which, but for the Settlement contained in the Plan, would have been distributed to the Bank Group.

It must be emphasized that Settlement and the enforcement of the subordination agreements were both essential elements of the Plan, and the Bank Group would not have supported the Plan absent these provisions. The RTC's attack on transactions that were central to the consummated Plan, which cannot now be undone, must, therefore, be dismissed as moot. To proceed to set aside the enforcement of the subordination agreements would, of necessity, unravel the Plan and the Settlement and would require returning the Debtors to the Bankruptcy Court as non-discharged debtors.

Such a scenario is unfathomable. It is not now possible to reverse the multitude of transactions executed pursuant to the Plan and in reliance on the existence of reorganized Debtors. For example: How is the Bank Group to recover the payments made to the Debtors' general unsecured creditors? How do the Debtors restore actions that were dismissed with prejudice? How does the Bank Group restore its liens that were released? What are the rights of nonparties who entered into transactions with a reorganized debtor who now discover that the entity was, in fact, a chapter 11 debtor?

Other courts when faced with situations similar to that in the instant case have found the appeal to be moot. For example, in *In re Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir. 1993), holders of senior subordinated debentures issued by the debtor appealed from an order confirming the plan of reorganization. The appellants failed to seek a stay and subsequently the plan was consummated. The appellants styled their appeal as seeking limited relief and argued that plan provisions which released the claims of creditors against certain third parties, were invalid and could be eliminated without affecting the confirmed and consummated plan. The Seventh Circuit, after a discussion of the mootness doctrine, reasoned that "[i]f the releases constitute an integral element of the bargain rep-

of granting HUD's request for a stay pending appeal).

Moreover, the RTC, in seeking a stay could have pointed out that the Debtors and the Bank Group asserted in the Bankruptcy Court that the issues of subordination and plan confirmation were inextricably linked and that, if that argu-

ment were accepted on appeal, it would be difficult, if not impossible, to equitably fashion any remedy in favor of the RTC absent a stay.

In sum, without predicting what the outcome of a motion for a stay would have been, this Court sees no persuasive reason why such a motion should not have been made.

resented by the Plan, then substantial consummation of the Plan would preclude the sort of challenge raised by appellants." *Id.* at 1048. The Seventh Circuit held:

> The Plan, including the Releases, represents a consensual arrangement arrived at through lengthy negotiation and designed to serve a number of goals.... Appellants have not shown that the Releases are not an essential part of the Plan nor have they offered any compelling reason for us to upset the bargain already struck. Nullification of the Releases at this juncture would amount to imposing a different plan of reorganization on the parties. Accordingly, because the Plan has been substantially consummated, this appeal is moot.

*Id.* at 1049.

Similarly, in *In re Crystal Oil Co.*, 854 F.2d 79 (5th Cir.1988), an appeal was dismissed because the appellant had failed to obtain a stay and distributions had begun to be made under the confirmed plan. The Court reasoned:

> If we accept [appellant's] argument, Bankers Trust must abide by the earlier concessions it made to obtain court approval of a plan, and then relinquish the benefits of these sacrifices. We decline to deprive Bankers Trust of the benefits it bargained for without giving Bankers Trust a chance to reevaluate the concessions it made to get them. We cannot give Bankers Trust this right without jeopardizing the entire plan should Bankers Trust retract major concessions. Moreover, Bankers Trust bondholders and other creditors and customers of Crystal will certainly suffer widespread prejudice if the present plan is scrapped. Finally, loss of this plan would disrupt a very successful reorganization. Chances are good that granting [appellant] the relief it requests would destroy the present plan and require the bankruptcy court to start anew.

*Id.* at 81–82 (citations omitted); *see also In re Public Serv. Co. of New Hampshire*, 963 F.2d at 474–75 (First Circuit found appellate review of a substantially consummated plan of reorganization involving, among other things, financing arrangements that could not "stand independently and apart" from the Plan moot; reasoning, in part, that reversal of the order appealed from would "present a daunting assignment for the Humpty Dumpty repairman" and would require "rearranging the stage on which the financial calculations of nonparty investors in the reorganized company were set and their investments reliantly made) (citations and internal quotations omitted); *Miami Center Ltd. Partnership v. Bank of New York*, 838 F.2d 1547, 1556–57 (11th Cir.), *cert. denied*, 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988) (appellants sought, among other things, the reinstatement of an action against the Bank of New York ("BNY") that was dismissed pursuant to the plan of reorganization; Court compared the relief the appellants requested against what BNY had "bargained for, and received, as part of the reorganization plan, and the consequences to the plan of granting the [appellants'] prayers" and held that the relief sought strikes "at the sale to [BNY] and the reorganization plan as a whole" and that the provisions in the plan were interrelated, the court concluded that "[g]ranting the remedies the [appellants] seek would create an unmanageable, uncontrollable situation for the Bankruptcy Court") (citations and internal quotations omitted); *In re Roberts Farms*, 652 F.2d at 797 (where transactions do not stand independently from the plan, but rather "were contemplated by the plan of arrangement" and the plan has largely been implemented, reversal of the confirmation order, "which would knock the props out from under the authorization for every transaction that has taken place, would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court"); *In re 1515 Broadway Assocs.*, 153 B.R. 400, 407 (S.D.N.Y.1993) ("The reorganization of the limited partnership is at the core of the reorganization plan, and forms a part of the parties' settlement that cannot be severed and altered now without effects on other parts of the Plan") (citations omitted).

Thus, application of the factors enumerated by the Second Circuit in *Chateaugay II* mandate a dismissal of the RTC appeal. 10 F.3d at 952–53. First, this Court cannot order effective relief because it cannot restore the *status quo*. Second, and closely

related to the first, in light of the fact that the enforcement of the subordination agreements was integral to the Plan, it cannot be excised without unraveling the consummated Plan which would create an unmanageable and uncontrollable situation since the parties cannot be restored to the *status quo ante*. Third, the relief the RTC seeks would affect the re-emergence of the Debtors as a revitalized entity (particularly with respect to the reorganized Debtors' relationships with its trade creditors and other non-party creditors). Finally, as discussed at length, the RTC's absolute failure to even seek a stay has created a situation where it would be wholly inequitable to reverse the Confirmation Order, even if reversal is limited to paragraph 7 of that order.

Judge Goettel's observation and conclusions in *In re Texaco* are appropriate here. 92 B.R. 38. There, appellants argued that a provision of a plan releasing claims arising out of the Texaco–Getty merger was unnecessary to, and should be severed from, a confirmed plan of reorganization. Judge Goettel, however, found that in the face of "unequivocal and uncontradicted testimony, it is simply untenable to suggest that we would excise the Release Provisions without affecting the settlement and, *ipso facto*, the now-confirmed and consummated reorganization." *In re Texaco*, 92 B.R. at 49. The court reasoned that the release provisions at issue "strike at the very heart of the compromise and settlement in this case. Their rescission would undermine the entire reorganization, creating, it seems to us, a nightmarish situation for the bankruptcy court on remand." *Id.* at 50 (citations omitted). Thus, Judge Goettel concluded "[a]lthough appellants here profess that they do not seek an outright reversal of the Confirmation Order, ... the relief sought goes to the very core of the Reorganization Plan and cannot be severed." *Id.* at 51.

*Jurisdictional Challenges Can be Dismissed Under Chateaugay II for Mootness*

The RTC argues that "[w]here an issue exists as to whether a lower court has subject matter jurisdiction, such issue cannot become moot on appeal and can always be raised on appeal". January 12, 1995 letter of Richard Lieb, Esq. at 5; *see also* Guzinski Affidavit at ¶ 4 ("RTC has an absolute right to be heard on the merits of [its claim that the Bankruptcy Court lacked subject matter jurisdiction to enforce the subordination agreements] and that such issue cannot be mooted"). The cases cited by the RTC do not, inevitably, provide support for the RTC's position, particularly on the facts before us.

*In re 1515 Broadway Assocs., L.P.*, 153 B.R. 400 (S.D.N.Y.1993), cited by the RTC, involved appeals of a confirmation order by both New York State ("State") and New York City ("City") where the plan of reorganization had been consummated. The debtor moved to dismiss both appeals as moot. The State's appeal sought relief in the form of requiring the debtor to file tax returns and other documents, so that the collection of gains tax could be calculated to the extent that such tax returns demonstrated the tax liability of non-debtor parties resulting from the real property transfers effected pursuant to the plan. 153 B.R. at 408. However, at the time the *1515 Broadway* confirmation order was entered, section 1146(c) of the Bankruptcy Code had been judicially interpreted to exempt real property transfers pursuant to a chapter 11 plan from gains taxes. Subsequent to the date of the *1515 Broadway* confirmation order and prior to disposition of that appeal, the exemption decision was reversed in *In re 995 Fifth Ave. Assoc., L.P.*, 963 F.2d 503 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 395, 121 L.Ed.2d 302 (1992). As a consequence, the real property transfers in *1515 Broadway* were not exempt from potential gains taxes and the issue of filing tax returns, which had not been considered by the Bankruptcy Court, became relevant. In that context, the District Court stated:

> Without deciding the merits of these issues on the motion to dismiss, it is enough here to note that an issue which could not have been considered by the Bankruptcy Court cannot be moot.

*In re 1515 Broadway*, 153 B.R. at 408.

Simply put, the RTC's reference to the above-quoted language in *1515 Broadway* as standing for the proposition that an appeal of a claimed failure of subject matter jurisdic-

tion cannot be mooted is rejected since neither the State nor the City in *1515 Broadway* asserted that the lack of subject matter jurisdiction over the issue of gains tax liability prevented application of the mootness doctrine.

To the same effect is the RTC's reference to *Ward v. Brown*, 22 F.3d 516 (2d Cir.1994). *Ward* cites the well-settled principle that "it has been the rule since nearly the inception of our republic that subject matter jurisdiction may be raised at anytime." *Ward v. Brown*, 22 F.3d at 519. *Ward*, does not, however, stand for the proposition, as the RTC asserts, that an appeal for lack of subject matter jurisdiction can never be mooted despite the presence of the factors supporting mootness set forth in *Chateaugay II*. Stated differently, *Ward* stands for the well-settled proposition that an objection to jurisdiction can always be raised, even on an appeal, but not that an appeal for lack of jurisdiction by the lower court will be entertained by the appellate court despite the mootness doctrine of *Chateaugay II*.

Cases presenting analogous challenges to jurisdiction have been dismissed based on mootness. For example, in *In re Specialty Equip. Cos.*, the Seventh Circuit dismissed an appeal as moot notwithstanding appellants' challenge, which the appellants denominated as a jurisdictional challenge, to the bankruptcy court's approval of that portion of a plan of reorganization that released nondebtor third parties from liability. 3 F.3d 1043, 1047 (7th Cir.1993); *see also In re Sullivan Central Plaza I, Ltd.*, 914 F.2d 731, 735 (5th Cir.1990) (Court rejected appellants' urging that the Court "must carve out an exception to the general mootness rule to hear its self-ascribed due process violations and its allegations that the bankruptcy court exceeded its powers" and dismissed as moot an appeal from an order of the bankruptcy court vacating an injunction, which led to the foreclosure of the property at issue); *In re Gilchrist*, 891 F.2d 559, 561 (5th Cir.1990) (section 363(m) of the Bankruptcy Code's requirement that an appeal from an order authorizing a sale of property must be stayed pending appeal, lest the appeal be rendered moot, applies even where the appellant challenges the bankruptcy court's jurisdiction to conduct the sale in question) (citations omitted); *In re Sax*, 796 F.2d 994, 998 (7th Cir.1986) (same) (citations omitted).

■ As stated above, the judicially derived mootness doctrine is premised on the fundamental jurisdictional tenet that federal courts are empowered to hear only actual cases and controversies. U.S. Const. art. III, § 2; *see also Chateaugay II*, 10 F.3d at 949–50 (citations omitted); *In re Texaco*, 92 B.R. at 45 (citations omitted). In the bankruptcy context, an appeal is properly dismissed as moot when an appellate court lacks the power to provide any effective relief to the prevailing party or where, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable. *Chateaugay II*, 10 F.3d at 949–50 (citations omitted); *In re Texaco*, 92 B.R. at 45 (citations omitted). The mootness doctrine "avoid[s] advisory opinions on abstract propositions of law". *In re Texaco*, 92 B.R. at 45 (quoting *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969)). Since the Court has determined that enforcement of the subordination agreements cannot be excised from the Plan without unraveling the consummated Plan, which would create an unmanageable and uncontrollable situation, and that the Court cannot order effective relief because it cannot restore the parties to the pre-consummation status quo, any ruling on the merits would be purely advisory.

The Court has considered the other arguments of the RTC in opposition to Appellees' motion and finds them to be without merit.

## CONCLUSIONS

For the reasons set forth above, Appellees' motion to dismiss the appeal is granted. The Clerk of the Court is directed to dismiss the appeal.

SO ORDERED.