Peter Saltini, Plaintiff,

against
North Sea Development LLC, RICHARD J. GHERARDI, GLENN CALLAHAN, RICHARD F. GHERARDI, COAST DEVELOPMENT GROUP, LLC, SAND DOLLAR DEVELOPMENT CORP, SAND DOLLAR CAPITAL GROUP LLC, COAST DEVELOPMENT, CORP., D & R FAMILY REALTY GROUP LLC, WAVE CREST DEVELOPMENT AND HOLDING CORP., ACRES CAPITAL, LLC, RELIANCE STANDARD LIFE INSURANCE CO., Defendants.


604265-18

JEFFREY B. HULSE, ESQ.
Attorney for Plaintiff
295 North Country Road
Sound Beach, New York 11789
ROSENBERG & STEINMETZ PC
Attorneys for Defendants Acres Capital LLC and Reliance Standard Life Insurance Co.
181 S. Franklin Avenue, Suite 604
Valley Stream, New York 11581


Elizabeth H. Emerson, J.

Upon the following papers read on this motionto dismiss ; Notice of Motion and supporting papers 21-35 ; Notice of Cross Motion and supporting papers; Answering Affidavits and supporting papers 38-47 ; Replying Affidavits and supporting papers 49 ; it is,
ORDERED that this motion by the defendants Acres Capital, LLC, and Reliance Standard Life Insurance Co. for an order dismissing the complaint insofar as it is asserted against them is granted.
The plaintiff was the owner of three parcels of real property in Southampton, New York ("Lot 1," "Lot 2," & "Lot 3"). In 2015, he and the defendant Coast Development Group LLC ("Coast") formed the defendant North Sea Development LLC ("North Sea") to construct high-end homes on the three parcels. North Sea is owned 51% by Coast and 49% by the plaintiff. The members of Coast are the individual defendants, Richard J. Gheradi, Richard F. Gherardi, and Glenn Callahan, each of whom has a one-third membership interest in Coast. In order to obtain financing for the project, the plaintiff conveyed title to the parcels to three separate LLCs (one for each parcel) in which North Sea had a 100% membership interest (the Property LLCs). The Property LLCs then obtained financing from the defendants Acres Capital, LLC, and Reliance Standard Life Insurance Co. (collectively "the Lender"). On or about February 5, 2016, the Property LLCs borrowed a total of $11,580,000 from the Lender (the "Senior Loan"): $4,212,439 as an acquisition loan, $5,048,300 as a building loan, and $2,319,261 as a project loan. Each of the three loans was evidenced by a promissory note and secured by a mortgage on the three parcels, among other things. 
Also on or about February 5, 2016, the plaintiff sold the three parcels to North Sea for $8,090,000. At the closing, the plaintiff was paid $3,829,806, and North Sea executed a promissory note in his favor for the balance, $4,260,194 (the"Mezzanine Note" or "Mezzanine Loan"). The Mezzanine Loan was secured by a pledge agreement executed by Coast granting the plaintiff a security interest in Coast's membership interest in North Sea. The Mezzanine Note contained two repayment options: (1) at such time and in such amount as provided in paragraph 28(F) of North Sea's operating agreement,[FN1]
or (2) $784,634 at the closing of the sale of Lot 1, $1,105,860 at the closing of Lot 2, and the balance (unpaid principal and interest) on the sale of Lot 3 or November 1, 2019, whichever is sooner.
The relationship between the Lender and the plaintiff (the "Mezzanine Lender") is governed by an Intercreditor Agreement dated February 5, 2016. The Intercreditor Agreement [*2]provides, in pertinent part, as follows:
"Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan (including, without limitation, any future advances by the Senior Lender pursuant to the Senior Loan Documents or otherwise taken to protect the Premises or the Senior Lender's lien thereon or rights thereto), (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof[.]
* * *
"Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents (including, without limitation, increasing or decreasing the stated principal amount of the Senior Note, increasing or decreasing the interest payable under the Senior Note or altering any other payment terms under the Senior Note).
* * *
"[A]ll of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's right to payment by Borrower of the Senior Loan [FN2]
and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower and/or from the Premises prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are paid.
* * *
"[P]rovided that no Event of Default shall then exist under the Senior Loan Documents:
* * *
""[I]n the event that Mezzanine Lender has elected 'Option 2' pursuant to Section 28(F) of [*3]the Mezzanine Borrower Operating Agreement,[FN3]
Mezzanine Lender may accept the following amounts upon a bona fide sale on arms' length terms of Lot 1 and/or Lot 2, provided that the Senior Lender has received the Release Amount (as defined in the Senior Loan Agreement) . . . with respect to the release of Lot 1 or Lot 2, as applicable:
"(A) a payment of $784,634 from Mezzanine Borrower upon the sale of Lot 1
"(B) a payment of $1,105,860 from Mezzanine Borrower upon the sale of Lot 2[.][FN4]

The maturity date of the Senior Loan was August 5, 2017. In September 2017, the Property LLCs were in default, and the parties to the Senior Loan executed the first modification, which gave the Property LLCs up to three extensions of the maturity date for a period of three months each, provided that they met certain conditions. The first modification also increased the release amounts for Lots 1 and 2 from $4,303,500 to $6,000,000, respectively. The Property LLCs received two extensions, but they were unable to meet the conditions for the third extension. The Senior Loan matured on February 5, 2018, and the parties agreed to a second modification, which extended the maturity date to June 5, 2018. A third modification extended the maturity date to August 23, 2019, and increased the principal amount of the loan from $11,850,000 to $13,385,000. The third modification also reduced the release amounts to $5,000,000 each for Lots 1 and 2. The homes on Lots 1 and 2 are now almost compete, and they are currently being marketed for sale at listing prices of $6,495,000 and $6,995,000, respectively. 
The plaintiff commenced this action on March 5, 2018. The plaintiff alleges that Coast and the individual defendants, Richard J. Gheradi, Richard F. Gherardi, and Glenn Callahan (collectively "the Coast defendants") assumed full and complete control over all aspects of the project and made substantial errors in the design and construction of the homes, which caused extensive and unnecessary delays. The plaintiff also alleges that the Coast defendants misused and converted funds that were to be used for construction of the homes. The plaintiff alleges that, as a result, the homes will be sold at prices well below those anticipated for the project and that North Sea will be unable to pay him the amounts due under the Mezzanine Loan. The plaintiff further alleges that the Lender, i.e., the defendants Acres Capital, LLC ("Acres"), and Reliance Standard Life Insurance Co. ("Reliance"), aided and abetted the Coast defendants. The complaint contains ten causes of action, only three of which are asserted against Acres and Reliance: the third cause of action for the appointment of a receiver, the ninth cause of action for breach of fiduciary duty, and the tenth cause of action for tortious interference with contract. Acres and Reliance move to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7) insofar as it is asserted against them.
The plaintiff does not oppose dismissal of the third cause of action, in which he seeks to have himself appointed as a receiver to complete the project. Moreover, receivership is a provisional remedy and can never be the ultimate object of an action (see generally, CPLR art 64; 13 Carmody-Wait 2d§ 83:14). Accordingly, the third cause of action is dismissed insofar [*4]as it is asserted against Acres and Reliance.
In support of the ninth cause of action for breach of fiduciary duty, the plaintiff contends that, relying on promises by the Lender, he gave up a position of security and control over the project to become a mezzanine lender with no vote and no control whatsoever. The plaintiff contends that his reliance required the Lender to do whatever he would have done to supervise and manage the project so that the homes were completed properly, in a workmanlike manner, within budget, and on time. The plaintiff contends that both he and the Lender knew that, absent the Lender's performance of these duties, there would not be sufficient funds from the sale of the homes to pay both the Lender and himself. The plaintiff contends that this created a fiduciary duty, which the Lender breached.
A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another (In re Best Products Co., Inc., 168 BR 35, 69, appeal dismissed 177 BR 791 [SDNY), affd 68 F3d 26 [2nd Cir]). Under New York law, when a contractual subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement and the words of that agreement are given their plain, ordinary, and usual meaning (Id.). The Intercreditor Agreement, which is the only contractual agreement between the plaintiff and the Lender, provides, "Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim." Acceptance of the plaintiff's version of the transaction would require the improper consideration of parol evidence, contradicting the clear terms of the Intercreditor Agreement (Demler v Sokolowski, 20 Misc 3d 135[A] [App Term, 1st Dept]), which contains a merger clause, precluding any extrinsic proof to add or vary its terms (Primex Intl. Corp. v Wal-Mart Stores, 89 NY2d 594, 600).
In any event, it is well settled that parties engaged in an arms' length business transaction are not fiduciaries (OppenheimerFunds, Inc. v TD Bank N.A., 2014 NY Slip Op 30379[U] at * 11 [and cases cited therein]), especially when, as here, they are sophisticated business people (Saul v Cahan, 153 AD3d 947, 949) who were represented by counsel (Abercrombie v Andrew College, 438 F Supp 2d 243, 274 [SDNY]). Moreover, the plaintiff's version of the transaction imputes to the Lender duties to supervise and manage the project that are not found in the record. The documentary evidence establishes that the Lender's obligation was merely to provide financing. Other defendants, specifically North Sea and the Coast defendants, were responsible for construction of the homes. 
Affording the complaint a liberal construction, accepting the facts alleged therein as true, and granting the plaintiff the benefit of every possible favorable inference (Saul v Cahan, supra), the complaint fails to allege "special circumstances" that could have transformed the business relationship between the plaintiff and the Lender into a fiduciary relationship, such as control by one party of the other for the good of the other or creation of an agency relationship (L. Magarian & Co. v Timberland Co., 245 AD2d 69, 70). The plaintiff, an experienced architect, was not under the control of the Lender. That he was under financial pressure and had [*5]to give up certain things in order to obtain financing for the project does not create a fiduciary relationship. Accordingly, the ninth cause of action is dismissed. 
The plaintiff contends that the Lender breached the duty of good faith and fair dealing implicit in all contracts. The plaintiff contends that the Lender furthered its own economic interest by making modifications to the Senior Loan, such as increasing the release price, thereby making it impossible for him to be repaid from the sale of the homes. 
Courts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract that it creates a new term or when alleged misconduct is expressly allowed by the contract (In re Musicland Holding Corp., 386 BR 428, 439 affd 318 Fed Appx 36 [2nd Cir]). The Intercreditor Agreement clearly provides that the Mezzanine Loan is subordinate to the Senior Loan and "all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof." The court cannot employ the covenant of good faith and fair dealing to impose on the parties obligations that are inconsistent with the express terms of the Intercreditor Agreement (Id.). Unless a subordinated creditor can show some inequitable conduct which harmed the junior creditor, such as a subsequent fraudulent transfer or preference, the subordination agreement will be enforced, even if the senior creditor uses its bargaining position to improve the status of its existing claims (In re Best Products Co., Inc., supra).
Affording the complaint a liberal construction, accepting the facts alleged therein as true, and granting the plaintiff the benefit of every possible favorable inference (Saul v Cahan, supra ), the plaintiff has failed to show that the Lender engaged in inequitable conduct that harmed him. The modifications to the Senior Loan were made after the Property LLCs defaulted to provide the Lender with additional security. While the Lender initially increased the release price to $6,000,000, it subsequently reduced it to $5,000,000. Moreover, the properties have not been sold yet, and two of the three are currently listed for sale at prices well above the reserve amount. The plaintiff's contention that the Lender's actions have made it impossible for him to be repaid are entirely speculative.Accordingly, the court finds that the plaintiff has failed to state a cause of action for breach of the covenant of good faith and fair dealing.
The tenth cause of action alleges that Acres and Reliance induced a breach of the contract between North Sea and the plaintiff, i.e., the Mezzanine Note. As previously noted, the plaintiff's contention that the Lender's actions have made it impossible for him to be repaid is entirely speculative. In any event, the Lender's actions in attempting to protect its security interest cannot be construed as malicious or carried out with the intent to harm the plaintiff (see, Ultramar Energy Ltd. v Chase Manhattan Bank, N.A., 179 AD2d 592). Procuring the breach of a contract in the exercise of an equal or superior right is action with just cause or excuse and is justification for what would otherwise be an actionable wrong (Felsen v Sole Café Mfg. Corp., 24 NY2d 682, 687). Accordingly, the complaint fails to state a cause of action for tortious interference with contract. 
In sum, the motion is granted, and the complaint is dismissed insofar as it is asserted against Acres and Reliance.
Dated: September 9, 2019
J.S.C.



Footnotes

Footnote 1:North Sea's operating agreement contains two options, one of which ("Option 2") provides for the plaintiff to be paid on the sale of Lot 1 or Lot 2, but only if there are no defaults under the Senior Loan and the net sale proceeds of the sale of Lot 1 and/or Lot 2 are greater than the minimum release price, to be determined by the Lender in its sole, but reasonable, discretion. The Senior Loan initially provided for release amounts of $4,303,500 for Lots 1 and 2, respectively.

Footnote 2:The three Property LLCs, collectively, are the "Borrower of the Senior Loan."

Footnote 3:The "Mezzanine Borrower" is North Sea.

Footnote 4:These amounts are consistent with the second repayment option found in the Mezzanine Note.